**CAMBRIDGE OIL COMPANY, a Texas Corporation, Appellant,**

v.

**William O. HUGGINS, III, Trustee for William O. Huggins, III, Judith L. Huggins and Virginia Huggins May, Appellees.**

No. 13–88–038–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 9, 1989.

Rehearing Denied Feb. 28, 1989.

J. W. Cooper, Jr., Russell H. McMains, Corpus Christi, George F. Simons, Jr., Houston, Tex., for appellant.

William O. Huggins, III, Durango, Colo., for appellees.

Before NYE, C.J., and SEERDEN and BENAVIDES, JJ.

## OPINION

NYE, Chief Justice.

Cambridge Oil Company appeals a judgment rendered in favor of plaintiff William Huggins, III, as trustee for William Huggins, III, Judith Huggins and Virginia Huggins (Huggins). The judgment ordered recission, termination, and cancellation of a farmout agreement and awarded appellee $100,000.00 for pecuniary loss based upon a jury finding that Cambridge breached a fiduciary duty to Huggins regarding timely payment of royalties and gross negligence. The trial court also awarded plaintiff $1,500,000.00 in punitive damages.

Cambridge asserts in twenty-two points of error that there is a lack of evidence to support a monetary damage recovery, that there is no legal or factual basis for recovery in tort, that the evidence does not support a recission remedy for a non-fraud tort, and that there is no legal or factual basis for cancellation and forfeiture under a contract claim.

The Huggins family sold the acreage in question to Thomas O'Connor in 1983, retaining one-half of the royalty rights in the oil, gas, and minerals. As part of the agreement to sell, Huggins retained the right to all bonus monies if he could find a lessee before August 1983. In 1983, a Texas corporation named GSI, Inc., entered into an oil and gas lease with O'Connor, which covered the acreage in Goliad County. O'Connor held the executive rights. In spring 1985, GSI entered into a farmout agreement with appellant Cambridge Oil Company, the defendant. The farmout agreement contained a continuous development clause which required Cambridge to continue drilling within 120 days from completion of a producing well or the drilling of a dry hole. During the course of the farmout agreement, Cambridge requested and received several extensions of time to fulfill its development obligations. Pursu-

ant to the farmout agreement, as amended, Cambridge completed four producing wells and GSI executed four partial assignments to Cambridge.

In the fall of 1986, Cambridge again sought an extension of time to drill a new well. This amendment, dated September 26, 1986, is the focal point of the controversy in this case. At the time this amendment was requested, Cambridge was six months behind in the payment of royalties. In order for Cambridge to get an additional extension, certain conditions were agreed upon. The September 1986 amendment provided:

> You (Cambridge) represent and warrant that you shall in the future disburse all proceeds due us (Huggins and GSI) and the lessors (O'Connors) under the lease which is the subject of the agreement on a continuing, regular, and monthly basis and, in event you do not disburse such proceeds then we shall at our sole option: a) exercise the rights to obtain all proceeds due us from the purchaser; or b) terminate the agreement.

The well that was proposed to be drilled under the extended agreement was never completed, and Cambridge lost its right to drill on any other portion of the property.

Huggins brought suit contending that the September, 1986, amendment to the farmout agreement gave them the right to rescind the entire original farmout agreement and cancel the previously made assignment of interest earned from the original producing wells. Huggins also asserted that the failure to timely pay royalties constituted gross negligence and a breach of fiduciary duty for which they were entitled to damages. He claimed that their relationship with Cambridge was transformed from a relationship of lessor—lessee, farmor—farmee, to a particular fiduciary relationship because Cambridge had promised in writing to handle future royalty payments with more propriety than it had in the past.

It was undisputed that at the time of trial, Cambridge owed no royalties to the Huggins. The jury found that Cambridge breached a fiduciary duty in its dealings

with the Huggins. The court defined fiduciary capacity to mean "when the business he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relationship implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." The jury also found that Cambridge was grossly negligent in its dealings with the Huggins and awarded them $1,500,000.00 in exemplary damages. The jury also found $100,000.00 in actual damages.

Cambridge's argument under points nineteen through twenty-two concern the construction of the September 19, 1986, letter amendment to the farmout agreement. The question specifically is whether the failure to pay royalties due under the farmout agreement terminated the extension agreement of September 1986; or whether the failure to pay royalties cancelled the entire farmout agreement including the previously assigned interest that Cambridge had already earned.

The jury found that the failure to pay royalties caused a termination of the entire farmout agreement. They also found that the failure to pay royalties caused a cancellation of the partial assignments made to Cambridge under the farmout agreement. Cambridge asserts that the September 19, 1986 letter agreement is unambiguous and not subject to attack by parol testimony. All parties agree that there was nothing in the original farmout agreement or in the first two amendments to the farmout agreement that gave GSI, the farmor, the right to inhibit any of Cambridge's rights in the lease that were already earned by production for failure to pay royalties. The issue boils down to whether the phrase "terminate the agreement" creates ambiguity to allow the introduction of parol evidence to vary the terms of the extension agreement.

■ In construing a written contract, the court should ascertain the true intentions of the parties as expressed in the instrument. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). The trial court should examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). If a written instrument is so worded that it can be given a certain or definite legal meaning, then it is not ambiguous, and the court will construe the contract as a matter of law. A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one meaning. *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 778 (Tex.1962). Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Courts will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 530 (Tex.1987).

Paragraph 11 of the original farmout agreement reads, as follows:

Farmee's liability for failure to timely commence the drilling of the initial test well or to diligently pursue the drilling thereof shall be limited to the loss of any rights *to be earned* under this agreement. The foregoing shall not be construed to preclude or limit any rights Farmor may have, in law or in equity, by virtue of Farmee's negligence or willful misconduct, or for any breach by Farmee of any other obligation under this agreement (including, without limitations, the obligation to provide information to Farmor or to indemnify Farmor as hereinabove provided).

Time is of the essence of this agreement and if the operations specified are not commenced by the commencement dates and diligently pursued in a manner herein provided, or if you have not complied with each and all of the the terms and provisions of this agreement, Farmor shall be relieved of any and all obligations to make the assignment(s) herein specified or any part thereof, *except for acreage already earned according to*

*the terms of this agreement,* and the agreement shall terminate. (emphasis supplied).

Paragraph 4 of the September 19, 1986, letter agreement provides that:

Except as expressly modified herein, all other terms and conditions of our agreement are hereby ratified and confirmed and are and shall remain in full force and effect;

■ The original farmout agreement provided for the termination of the farmout agreement upon failure to timely commence drilling operations. The original agreement did not call for the termination of the agreement for failure to timely pay royalties. However, paragraph three of the September 19, 1986, amendment provided that Cambridge warranted that they would disburse all proceeds due the royalty owners on a continuing, regular, and monthly basis, or the farmor would have the option to exercise the rights to obtain all proceeds due from the first purchaser or terminate the agreement. The September amendment to the agreement states that not only must the development obligations be timely met, but the payment of royalty interests must likewise be timely. This is the clear unambiguous meaning of the September amendment. We find that the trial court was incorrect in rendering judgment that the failure of Cambridge to pay royalties caused a cancellation of the partial assignment made to Cambridge under the farmout agreement. The contract was unambiguous as a matter of law and the jury finding was therefore immaterial. The contract did not expressly state that the interest already earned by Cambridge by assignment would, in any way, be affected. We sustain point twenty-one.

■ Cambridge's first eighteen points concern fiduciary duty and damages. Cambridge argues that the jury finding of breach of fiduciary duty was legally erroneous and because they are not entitled to any actual damages, exemplary damages are not appropriate. A fiduciary duty arises from the relationship of the parties and not from the contract. *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984). Most familiar fiduciary relationships are thought of as arising from relationships of attorney and client, partners, close family relationships, and joint venturers, particularly when there is an agreement to share financial gains and losses. *See Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336–37 (Tex.1966). Fiduciary relationships may of course arise out of other relationships if over a long period of time parties have worked together for a joint acquisition and development of property previous to the particular agreement sought to be enforced. The relationship between a lessor and lessee is purely contractual absent some other special relationship created between the parties. *See Manges v. Guerra,* 673 S.W.2d at 183–84. (Manges and the Guerras were co-tenants in the mineral estate, and the benefits received by the Guerras depended solely upon Manges' management, creating a fiduciary relationship); *Comanche Land and Cattle Co. v. Adams,* 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ) (the owner of executive rights violated the duty of good faith when it purposely entered into an agreement calculated to defeat royalty owners' rights). *See also Sunac Petroleum Co. v. Parkes,* 416 S.W.2d 798, 803–5 (Tex.1966); *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966).

■ Here, Huggins claims that the relationship of the parties changed from merely lessor-lessee to one of confidentiality when Cambridge was allowed to continue further drilling. We find no evidence in the record to support that theory. In fact, the evidence supports the opposite notion. The reason the amendment to the farmout agreement was so worded was because the Huggins plaintiffs had serious problems with the way Cambridge was handling its business and wanted to put some "teeth" into the amendment. There was not a relationship of trust and confidence between the parties. The relationship was strictly contractual. We hold that there was no evidence that the farmout agreement itself created in law a trust or that the relationship between the parties, through the Sep-

tember amendment, created a fiduciary relationship. We sustain point five.

The jury awarded Huggins $1,000,000.00 in exemplary damages based upon a breach of fiduciary duty. However, we have found no evidence to support the existence of a fiduciary duty or its breach. Exemplary damages may not be recovered in the absence of proof of a distinct tort. *Nabours v. Longview Savings and Loan Association*, 700 S.W.2d 901, 905 (Tex. 1985). Because there was no evidence of a breach of fiduciary duty, we hold that there is no basis upon which to uphold the exemplary damage award based upon that theory.

Cambridge also complains that there was no evidence or insufficient evidence to support the jury's finding that the Huggins suffered $100,000.00 actual damages for pecuniary loss. Virginia Huggins admitted that she received all the money owed to her by Cambridge. There was no evidence offered to suggest that the Huggins were owed any money by Cambridge.

Huggins suggests in the brief that Cambridge received approximately $800,000.00 in sixteen months for the sale of gas from the wells. The record shows that Cambridge expended $700,000.00 to drill the wells. They suggest that this is evidence of $100,000.00 pecuniary loss. We fail to see how Cambridge's profit in any way equates to pecuniary loss to the Huggins in the face of undisputed evidence that they were paid all that they were owed under the farmout agreement. The only damages which could have been suffered was interest on the late paid royalties. This element of damage was neither plead nor proven. We sustain point one.

Cambridge also argues that there was no evidence to support the jury's findings of gross negligence. Gross negligence is that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

Huggins argues that the acts of Cambridge in issuing insufficient funds checks, withholding royalties after being paid by the gas buyer and the over all indifference to the Huggins constituted gross negligence. The finding of gross negligence relates totally to the relationship of the parties created by the farmout agreement. Gross negligence for a breach of contract will not entitle an injured party to exemplary damages, even if the breach is intentional. *Jim Walter Homes v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). To support an award of exemplary damages, a plaintiff must prove distinct tortious injury with actual damages. No distinct tort or damages were proven. We sustain points three, four and seven.

Cambridge also complains about the award of $500,000.00 exemplary damages for gross negligence. Punitive damages are recoverable only after proof of a distinct, willful tort. *Nabours*, 700 S.W.2d at 904. Punitive damages must be contingent on a finding of actual damages since actual damage is a necessary element of the underlying tort upon which the punitive damages are to be based. No tort issue was submitted to the jury other than a breach of fiduciary duty. We find that Huggins is not entitled to punitive damages because there was no proof of a distinct tort. The jury's award of exemplary damages was improper. We sustain point two.

We also sustain appellant's points thirteen, fourteen, fifteen, sixteen, and seventeen dealing with recission based on the findings of breach of fiduciary duty and gross negligence.

The judgment of the trial court is REVERSED and judgment is here RENDERED that plaintiff Huggins take nothing.[1]

---

1. Appellee's motion to dismiss the appeal is denied.