George Bradford COLEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–01–00526–CR.

Court of Appeals of Texas, Corpus Christi–Edinburg.

March 4, 2004.

Rehearing En Banc Overruled April 22, 2004.

Scott R. Donaho, Attorney At Law, Floresville, for Appellant.

Michael A. Sheppard, Dist. Atty., Robert C. Lassmann, Asst. Dist. Atty., Cuero, for Appellee.

Before Justices HINOJOSA, CASTILLO, and CHAVEZ.[1]

1. Retired Justice Melchor Chavez, was assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

## OPINION

Opinion by Justice HINOJOSA.

After a bench trial, the trial court found appellant, George Bradford Coleman, guilty of the third-degree felony offense of misapplication of fiduciary property of the value of $20,000 or more, but less than $100,000.[2] The court assessed appellant's punishment at three years imprisonment and a $2,500 fine, suspended the prison sentence, and placed him on community supervision for a term of three years. The trial court has certified that this case "is not a plea-bargain case, and the defendant has the right of appeal." See Tex.R.App. P. 25.2(a)(2). In thirteen points of error, appellant contends the trial court erred in failing to quash the indictment and the evidence is legally and factually insufficient to support the conviction. We affirm.

### A. BACKGROUND

In 1996, appellant, as the one-hundred-percent owner and only officer of Midstates Corporation ("Midstates"), acquired the operating interest in two unitized wells located in DeWitt County. These wells were known as the Nordheim and Sucher Gas Units. The predecessor operator, Cougar Oil and Gas Company, Inc. ("Cougar"), assigned its interest in the units to Midstates. Under the assignment, Midstates acquired all of Cougar's obligations to the royalty owners.

Tenneco Ventures Finance Corporation ("Tenneco") financed Midstate's acquisition of the Nordheim and Sucher Units from Cougar. To repay Tenneco, Midstates executed a "Conveyance of Production Pay-

ment." The "conveyance" provided that Tenneco was to be paid a share of the production. As gas was sold, purchasers were to pay Tenneco directly. Tenneco's share of the production never came into Midstates' possession.

During the years 1998–1999, the price of oil and gas declined. As a result of these depressed prices, Midstates had judgments assessed against it in the amount of approximately $200,000. During this time period, Midstates did not pay royalties regularly to the royalty owners. Midstates was late on some royalty payments or failed to pay them at all. Midstates also issued checks drawn on accounts with insufficient funds to several royalty owners.

In January 1998, a criminal investigation into the records of Midstates was initiated. The investigation revealed that Midstates, and later Outline Oil Corporation ("Outline"),[3] was selling the gas produced from the Nordheim and Sucher Units to Gulf Coast Energy Marketing Company ("Gulf Coast"). The investigation also revealed that Midstates had requested, in writing, that Gulf Coast forward one hundred percent of the net revenue income, including the royalties, to Midstates and agreed to indemnify Gulf Coast. In accordance with their agreement, Gulf Coast included the royalty owners' share of the production in the payments it made to Midstates. As revenue was received from Gulf Coast for the sale of gas, Midstates would transfer the money to an "operating account" to avoid garnishment by judgment creditors. Instead of suspending funds for the royalty owners, Midstates would pay vendors

However, because Justice Chavez's appointment expired on August 31, 2003, he is not participating in this opinion.

**2.** See Tex. Pen.Code Ann. § 32.45 (Vernon Supp.2004).

**3.** In mid 1998, Midstates transferred the operating interest in the two units to Outline. Outline was also wholly owned by appellant.

and operating expenses from the operating account. As the sole officer of Midstates and Outline, appellant had the exclusive authority to write checks and make withdrawals from the Midstates and Outline accounts.

After failing to be timely paid, some royalty owners in the Sucher Unit filed a civil suit against Midstates. This action resulted in a settlement of all claims of those royalty owners participating in the suit. In August of 1999, Midstates voluntarily assigned its income from the Sucher and Nordheim Units to a new operator, Range Resources, with the understanding that Range Resources would pay all royalty owners.

### B. SUFFICIENCY OF THE EVIDENCE

In his first twelve points of error, appellant contends the evidence is legally and factually insufficient to support his conviction for the offense of misapplication of fiduciary property. Appellant was charged in a one-count indictment with twenty-four separate violations of that offense.

A person commits the offense of misapplication of fiduciary property if he intentionally, knowingly, or recklessly, misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held. TEX. PEN.CODE ANN. § 32.45(b) (Vernon Supp.2004). Under the statute, "misapply" is defined as dealing "with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property." TEX. PEN.CODE ANN. § 32.45(a)(2) (Vernon Supp.2004).

### 1. *Standards of Review*

When we review the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Johnson v. State,* 23 S.W.3d 1, 7 (Tex. Crim.App.2000); *Rosillo v. State,* 953 S.W.2d 808, 811 (Tex.App.-Corpus Christi 1997, pet. ref'd). We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

When we review the factual sufficiency of the evidence, we review all of the evidence and set aside the verdict only if (1) the evidence is so weak as to be clearly wrong and manifestly unjust or (2) the verdict is against the great weight of the evidence. *Johnson,* 23 S.W.3d at 11. We are not bound to view the evidence in the light most favorable to the prosecution and may consider the testimony of all the witnesses. *Id.* at 10–12. We are not free to reweigh the evidence and set aside the verdict merely because we believe that a different result is more reasonable. *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); *Clewis v. State,* 922 S.W.2d 126, 135 (Tex.Crim.App.1996). The trial court, when sitting as the trier of facts, is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Joseph v. State,* 897 S.W.2d 374, 376 (Tex.Crim.App.1995). Disagreeing with the fact finder's determination is appropriate only when the record clearly

indicates that such a step is necessary to arrest the occurrence of a manifest injustice. *Johnson*, 23 S.W.3d at 10–12. Otherwise, due deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence. *Id.*

These standards of review apply equally to cases comprised wholly of circumstantial evidence as they do when reviewing cases in which direct evidence exists. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim. App.1999); *King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995); *Vela v. State*, 771 S.W.2d 659, 660 (Tex.App.-Corpus Christi 1989, pet. ref'd).

### 2. *Fiduciary Relationship*

■ In his first and seventh points of error, appellant contends the evidence is legally and factually insufficient to prove that he had a fiduciary relationship with each royalty owner.

Appellant correctly points out that fiduciary duties arise from the relationship of the parties and not from a contract. *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex.1984); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 544 (Tex.App.-Corpus Christi 1989, writ denied). Absent some other special relationship, the relationship between a lessor and lessee is purely contractual in nature. *Cambridge Oil Co.*, 765 S.W.2d at 544.

However, section 32.45 of the penal code does not construe the term "fiduciary" in such a strict manner. *See Coplin v. State*, 585 S.W.2d 734, 735 (Tex.Crim.App.1979). Under that statute, the term "fiduciary" includes any person acting in a fiduciary capacity, other than a commercial bailee.

TEX. PEN.CODE ANN. § 32.45(a)(1)(C) (Vernon Supp.2004). In common parlance, a fiduciary refers to a person or entity having a duty, created by his undertaking, to act primarily for another's benefit in matters connected to the undertaking. *Huett v. State*, 970 S.W.2d 119, 124 (Tex.App.-Dallas 1998, no pet.) (citing BLACK'S LAW DICTIONARY 625 (6th ed.1990)). A person acts in a fiduciary capacity when the person handles money or property for the benefit of another person. *Gonzalez v. State*, 954 S.W.2d 98, 103 (Tex.App.-San Antonio 1997, no pet.).

Here, appellant instructed Gulf Coast to send all of the royalty owners' share of production directly to his company, Midstates.[4] In accordance with the lease agreements, the royalty payments held by appellant were clearly not his or for his benefit, but instead, were to be paid to the royalty owners. Appellant held the royalty payments in trust for the royalty owners' benefit, ultimately to be paid to the royalty owners pursuant to law and in accordance with the lease agreements. From the evidence, we conclude appellant was acting in a fiduciary capacity for this limited purpose. Appellant's first and seventh points of error are overruled.

### 3. *Criminal Violation of Law*

■ In his second and eighth points of error, appellant contends the evidence is legally and factually insufficient to prove a criminal violation of law because the royalty owners are parties to a contract and are charged with the duty to protect their own interest. The gist of appellant's contention is that an operator's failure to pay royal-

---

4. Pursuant to Texas law, Gulf Coast, as the "first purchaser" of the gas, had the legal obligation to pay the royalty owners their share of the gas production, unless the owner of the right to produce (Midstates) agreed in writing to incur the obligation. *See* TEX NAT. RES.CODE ANN. § 91.401(2) (Vernon 2001); *see also Koch Oil Co. v. Wilber*, 895 S.W.2d 854, 864 (Tex.App.-Beaumont 1995, writ denied).

ties to royalty owners is not criminal in nature.

Appellant correctly points out that the royalty owners are parties to a lease, and as such, are charged with the responsibility to protect their own interest. *See Harrison v. Bass Enters. Prod. Co.,* 888 S.W.2d 532, 538 (Tex.App.-Corpus Christi 1994, no writ). For such cases, the legislature has provided a civil remedy. *See* TEX. NAT. RES.CODE ANN. §§ 91.401–.404 (Vernon 2001). Sections 91.402 and 91.403 of the natural resources code protect royalty owners from payment delays. *See Concord Oil Co. v. Pennzoil Exploration & Prod. Co.,* 966 S.W.2d 451, 461 (Tex.1998) (quoting from House Comm. on Energy, Bill Analysis, Tex. H.B. 1775, 68th Leg., R.S. (1983)).

However, while appellant correctly interprets the purpose of sections 91.402 and 91.403 of the natural resources code, he mischaracterizes his own culpable conduct. Appellant's acts became criminal under section 32.45 of the penal code because he misapplied the royalty owners' money, contrary to the lease agreements and applicable law, not because he failed to pay the royalty owners. Because appellant committed such actions while he exercised management over both Midstates and Outline, he is criminally responsible for this offense as agent of these two corporations. *See* TEX. PEN.CODE ANN. § 7.23 (Vernon 2003). Appellant's second and eighth points of error are overruled.

### 4. *Commercial Bailee*

■ In his third and ninth points of error, appellant contends the evidence is legally and factually insufficient to prove that he was not a commercial bailee.

"Bailment" is defined as "a delivery of personal property by a bailor to a bailee for specific purposes under an express or implied agreement of the parties that when those purposes are accomplished the property will be returned to the bailor, kept until he reclaims it, or disposed of according to the agreement." *Talamantez v. State,* 790 S.W.2d 33, 36 (Tex.App.-San Antonio 1990, pet. ref'd).

In the instant case, appellant claims he was acting as a commercial bailee when he accepted delivery of the oil or gas as part of the business of an operator under an oil and gas lease. However, this does not describe appellant's conduct for which he was indicted. He did not accept the personal property of Gulf Coast for temporary storage, to be returned at a subsequent date or disposed of according to an express or implied agreement. Instead, appellant received proceeds from the sale of gas, a portion of which were royalties that belonged to the royalty owners. Appellant was required to hold those royalties in trust, for the benefit of the royalty owners, with the specific responsibility of paying the royalties to the royalty owners. Accordingly, we conclude the evidence was legally and factually sufficient to prove that appellant was not a commercial bailee. Appellant's third and ninth points of error are overruled.

### 5. *Misapplication of Property*

■ In his fourth and tenth points of error, appellant contends the evidence is legally and factually insufficient to prove that he acted pursuant to one scheme and continuing course of conduct to misapply the monies alleged in the indictment.

According to section 32.45, the term "misapply" means dealing "with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property." TEX. PEN.CODE ANN. § 32.45(a)(2) (Vernon Supp.2004). Thus, misapplication can be an omission or

failure to act where a duty to act exists. *Little v. State*, 699 S.W.2d 316, 318 (Tex. App.-San Antonio 1985, no pet.). "[P]roperty may be deemed misapplied only if it is handled in a manner giving rise to a substantial risk of loss and in contravention of an established duty to do otherwise." *Bynum v. State*, 767 S.W.2d 769, 775 (Tex. Crim.App.1989).

In the instant case, the evidence adduced at trial established a continuing course of conduct on the part of appellant. Appellant received monthly proceeds from the sale of gas and failed to either pay the royalty owners their share of the production or hold the royalties in a trust or other suspense account for future distribution. Appellant testified he transferred the monies he received between accounts and between Midstates and Outline in order to avoid garnishment by judgment creditors. This course of conduct was repeated for each month of the State's investigation.

After review of the relevant financial records, Gerald Culver, the State's expert accounting witness, established the amount of money Midstates received each month for gas purchases made by Gulf Coast from the subject wells. Culver also determined the amount of royalty that was owed to each royalty owner from the gas purchases. Culver then itemized the depletion of the various operating accounts each month. Culver's testimony established that the proceeds received each month by Midstates, which included the royalty owners' share, were not applied to pay the royalty owners for their share of production.

Appellant was the only person authorized to write checks and make withdrawals from the Midstates and Outline accounts. Appellant testified that he paid vendors and other operating expenses from the Gulf Coast payments, which included the royalties. Appellant admitted that the money he received on behalf of the royalty owners belonged to the royalty owners, not to him. Appellant was not authorized to use the royalties for his own benefit or the benefit of his company. Appellant further admitted that he did not pay the royalties to the royalty owners.

After viewing the evidence in the appropriate light, we conclude the evidence was legally and factually sufficient to prove that appellant misapplied the monies as alleged in the indictment. Appellant's fourth and tenth points of error are overruled.

### 6.  *Contrary to Agreement*

■ In his fifth and eleventh points of error, appellant contends the evidence is legally and factually insufficient to prove that he, as an oil and gas operator, intentionally, knowingly or recklessly misapplied property he held as a fiduciary, contrary to an agreement and law.

The crux of the offense here is that appellant dealt with the royalties in a manner contrary to the express provisions of the lease agreement and/or section 91.402 of the natural resources code. Here, the State introduced into evidence the leases under which Midstates owed the duty to pay each of the royalty owners for their percentage of production. The leases provided that the respective royalty owner's share of proceeds from the sale of gas was one-eighth of the net proceeds realized from the sale. Further, appellant testified regarding his knowledge of the applicable laws governing timely payment to the royalty owners. Section 91.402 of the natural resources code provides that payment of the proceeds must be made within ninety days of the end of the month in which gas is sold, unless there is a dispute or reasonable doubt concerning title to the interest

in the proceeds. TEX. NAT. RES.CODE ANN. § 91.402(a)-(b) (Vernon 2001).

The State, through the testimony of its expert witness, established a continuing course of conduct that appellant used monies received by his corporations, including royalties, for purposes other than paying the royalty owners their royalties. This was contrary to the lease agreement and/or section 91.402 of the natural resources code. While the State is not required to prove how appellant spent the money, it is required to prove the money was not used in compliance with the agreement. *See Johnson v. State*, 783 S.W.2d 19, 22 (Tex.App.-Fort Wort 1989, pet. ref'd); *Little*, 699 S.W.2d at 318. Appellant also admitted that he did not timely pay all royalty payments. If an agreement requires a person to hold funds in trust and to promptly pay the funds to the beneficiary, the failure to do so is a breach of the agreement. *Little*, 699 S.W.2d at 318. The evidence establishes that appellant misapplied property he held as a fiduciary, contrary to the lease agreements and applicable law. Appellant's fifth and eleventh points of error are overruled.

### 7. *Substantial Risk of Loss*

■ In his sixth and twelfth points of error, appellant contends the evidence is legally and factually insufficient to prove that appellant, as an oil and gas operator, intentionally, knowingly or recklessly misapplied property he held as a fiduciary in a manner that involved substantial risk of loss to each royalty owner. Appellant asserts that since the royalty owners had all been paid or had entered into a settlement agreement at the time of trial, the State failed to show beyond a reasonable doubt that he misapplied the royalties in a manner that involved a substantial risk of loss to each royalty owner.

"Substantial risk of loss" means a real possibility of loss. *Casillas v. State*, 733 S.W.2d 158, 164 (Tex.Crim.App.1986). The possibility need not rise to the level of a substantial certainty, but the risk of loss does have to be at least more likely than not. *Id.*

The record shows that appellant, as an oil and gas operator, knew the risks associated with the oil and gas market. Appellant, as the sole officer of Midstates, also was aware of the financial instability of the company. Yet despite this, appellant continued to receive royalty monies from Gulf Coast as the purchaser of the gas, and applied such monies to satisfy other financial obligations. Regardless of whether the complaining royalty owners were ultimately paid or reached a settlement agreement, the fact remains that the unauthorized diversion of the royalties presented a real possibility of loss of those monies. *See id.* At trial, appellant himself testified that the royalty owners' money, which should have been held in suspense, was gone. The State's expert witness established that the money was not in any account held by appellant. Thus, we conclude there was a substantial risk of loss to the royalty owners.

Accordingly, the State satisfied its burden of proving beyond a reasonable doubt that appellant misapplied property in a manner that involved substantial risk of loss to the owners of the property. *See Dwyer v. State*, 836 S.W.2d 700, 702 (Tex. App.-El Paso 1992, pet. ref'd). Appellant's sixth and twelfth points of error are overruled.

### C. MOTION TO QUASH INDICTMENT

■ In his thirteenth point of error, appellant complains the trial court erred in failing to quash the indictment. Specifically, appellant contends the language in the indictment that he committed the offense

by acting "contrary to an agreement and law" is too general and vague and did not give him notice of what "agreement and law". the State relied on. Further, appellant contends the State failed to plead facts which constituted recklessness, as required by article 21.15 of the code of criminal procedure. *See* Tex.Code Crim. Proc. Ann. art. 21.15 (Vernon 1989).

We review a trial court's ruling on a motion to quash an indictment under an abuse-of-discretion standard. *Thomas v. State,* 621 S.W.2d 158, 163 (Tex.Crim.App. 1980); *Hankins v. State,* 85 S.W.3d 433, 436 (Tex.App.-Corpus Christi 2002, no pet.). As a general rule, a charging instrument that tracks the language of a criminal statute possesses sufficient specificity to provide a defendant with notice of a charged offense. *State v. Edmond,* 933 S.W.2d 120, 128 (Tex.Crim.App.1996). The State need not allege facts which are merely evidentiary in nature. *Bynum,* 767 S.W.2d at 778.

In a single-count indictment, the State alleged that appellant, in one scheme and continuing course of conduct, committed the offense of misapplication of fiduciary property twenty-four different times. Each of the twenty-four paragraphs alleged that appellant:

did then and there intentionally, knowingly and recklessly, pursuant to one scheme and continuing course of conduct, misapply property, by dealing with it contrary to an agreement and law, to-wit: lawful money of the United States of the value of … he held as a fiduciary but not as a commercial bailee, to-wit: as an operator of an oil and gas lease, in a manner that involved substantial risk of loss to [royalty owner], the owner of

said property, and the person whose benefit the property was held, by then and there receiving money for the sale of oil and gas, including the proceeds due to the royalty owner, and the money was disbursed without paying the entire amount due the royalty owner.

The twenty-four paragraphs were identical, except for the name of the royalty owner and the amount allegedly misappropriated.

The indictment substantially tracks the language of section 32.45(b) of the penal code. Tex. Pen.Code Ann. § 32.45(b) (Vernon Supp.2004). The indictment identifies the property, the duty, the beneficiary, and the breach. Accordingly, we conclude it was sufficient to apprise appellant of the offense with which he was charged. *See Kline v. State,* 737 S.W.2d 895, 898 (Tex. App.-Houston [1st Dist.] 1987, pet. ref'd) (finding no need for State to plead nature of agreement under which appellant held property). Details of the terms of the agreement are evidentiary and, therefore, do not have to be specifically pleaded. *See Romine v. State,* 722 S.W.2d 494, 501 (Tex. App.-Houston [14th Dist.] 1986), *pet. ref'd,* 747 S.W.2d 382 (Tex.Crim.App.1988) (declining to require State to plead "what the agreement was" which would require State to plead its evidence).

■ We now address appellant's contention that the indictment was defective because it did not allege the acts relied upon to constitute recklessness. When recklessness[5] is a part or element of an offense, the charging instrument must allege, with reasonable certainty, the acts relied upon to constitute recklessness. Tex.Code Crim. Proc. Ann. art. 21.15 (Ver-

---

**5.** A person acts recklessly "with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and un-

justifiable risk that the circumstances exist or the result will occur." Tex. Pen.Code Ann. § 6.03(c) (Vernon 2003).

non 1989). Article 21.15 imposes two requirements on a charging instrument alleging reckless misconduct. *Hankins*, 85 S.W.3d at 436 (citing *State v. McCoy*, 64 S.W.3d 90, 92 (Tex.App.-Austin 2001, no pet.)). First, the indictment must allege the act or acts relied on to constitute the forbidden conduct committed with recklessness. *Id*. Second, the indictment must allege the acts or circumstances relied on to demonstrate that the forbidden conduct was committed in a reckless manner. *Id*.

Here, the indictment alleged that appellant disbursed money without paying the entire amount due the royalty owner. This meets the first requirement, as the indictment alleges with reasonable certainty the act relied on to constitute recklessness. *See id*. However, the second requirement is lacking because the indictment does not allege the acts or circumstances relied on to show that the forbidden conduct was committed in a reckless manner. Accordingly, we conclude the trial court erred in denying appellant's motion to quash the indictment.

■ Having found error, we must now address the question of harm. *See* Tex. R.App. P. 44.2. In a criminal case, the charging instrument itself must convey adequate notice from which the accused may prepare his defense. *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex.Crim.App.1988). A defect of form does not render an indictment insufficient unless the defect "prejudice[s] the substantial rights of the defendant." Tex.Code Crim. Proc. Ann. art. 21.19 (Vernon 1989). Error that does not affect substantial rights must be disregarded. Tex.R.App. P. 44.2(b). A substantial right is prejudiced only if the particular defect harmed the defendant. *Adams v. State*, 707 S.W.2d 900, 903 (Tex.Crim. App.1986). Thus, our inquiry must focus upon whether, in the context of the case, the State's failure to allege facts in the

indictment which constituted recklessness had an impact on the defendant's ability to prepare a defense. *Bynum*, 767 S.W.2d at 779. Further, if it had an impact, we must determine how great the impact was. *Id*.

Here, the record shows that appellant was given the opportunity to inspect the State's entire file during pretrial discovery. Further, appellant was the one-hundred-percent owner and only officer of Mid-states and clearly knew of the financial instability of his company. Nonetheless, appellant willingly accepted the responsibility of paying royalties directly to the royalty owners. As the operator under the applicable leases, appellant clearly knew which agreement and law governed the payment of the royalties. Appellant ardently defended his conduct, arguing his actions amounted to civil wrongs instead of criminal misconduct.

Under the circumstances of the present case, we cannot say that the lack of notice of additional factual allegations in the indictment hindered appellant's ability to prepare his defense. *See Adams*, 707 S.W.2d at 903–04. Since the defect in the charging instrument did not restrict appellant's opportunity to defend against the prosecution, we hold that the indictment did not prejudice appellant's substantial rights. *See* Tex.R.App. P. 44.2. We overrule appellant's thirteenth point of error.

The judgment of the trial court is AFFIRMED.

Retired Justice MELCHOR CHAVEZ not participating.

Justice CASTILLO, concurring.

I concur in the result and agree that the analytical construct defined by the Texas Court of Criminal Appeals in reviewing legal- and factual-sufficiency challenges in jury trials applies equally to nonjury trials. *See Malik v. State*, 953 S.W.2d 234, 240

(Tex.Crim.App.1997). The reference to bench trials was announced in *Malik* in one sentence:

> Hence, sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *This standard can uniformly be applied to all trials, whether to the bench or to the jury, whether or not the indictment is facially complete, and regardless of the specific wording of the jury charge actually given.*

*Id.* (emphasis added) (footnote omitted). The court of criminal appeals coined the term "hypothetically correct jury charge" as shorthand for *Malik's* cure for a specific ill: a defendant's acquittal on sufficiency grounds for charge error. *See id.* ("Moreover, the standard we formulate today ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted.").

After *Malik*, the court of criminal appeals refined what it meant by the term "authorized by the indictment." *Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App. 2000). *Curry* held that "authorized by the indictment" means "that a sufficiency review must encompass 'the statutory elements of the offense ... as modified by the charging instrument.'" *Fuller v. State*, 73 S.W.3d 250, 255 (Tex.Crim.App. 2002) (Keller, P.J., concurring) (quoting *Curry*, 30 S.W.3d at 404).

I conclude that in jury and nonjury cases alike, we measure the sufficiency of the evidence against the statutory elements of the offense as modified by the charging instrument. *See Curry*, 30 S.W.3d at 404. Accordingly, I concur in the result in this case because my analysis is the same as the majority's; only my use of language differs. I do not read *Malik* and *Curry* as mandating use of the *term* "hypothetically correct jury charge" in nonjury cases, only the *analysis* described by the two cases. *See Westfall v. State*, 970 S.W.2d 590, 595 (Tex.App.-Waco 1998, pet. ref'd) ("For the time being, we do not presume that this 'hypothetically correct jury charge' is applicable in bench trials."). Thus, my sufficiency review in this bench trial case measures the evidence against the statutory elements of the offense as modified by the charging instrument, not against a "hypothetically correct jury charge."