

## NUMBER 13-11-00468-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

JOSHUA ADAM LEWIS,                        Appellant,

v.

THE STATE OF TEXAS,                        Appellee.

### On appeal from the 413th District Court of Johnson County, Texas.

## MEMORANDUM OPINION[1]

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Chief Justice Valdez

Appellant, Joshua Adam Lewis, was convicted of one count of aggravated assault with a deadly weapon against a public servant, a first-degree felony and one count of injury to a child, a third-degree felony. *See* TEX. PENAL CODE ANN. §§

---

[1] This case is before the Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

22.02(a)(2), (b)(2)(B), (c) (West 2011), 22.04 (West Supp. 2011); *see also id.* § 22.01(a)(2) (West 2011). Appellant was sentenced to sixty-seven years' confinement for the aggravated assault of a public servant offense and ten years' confinement for the injury to a child offense. By three issues, appellant challenges his conviction for aggravated assault of a public servant. Specifically, appellant contends that the evidence is insufficient, the trial court abused its discretion when it did not allow him to publish an exhibit in its entirety, and the trial court erroneously admitted evidence of an extraneous offense. We affirm.

## I. THE EVIDENCE

Carol Brandy Lewis, appellant's wife, stated that on January 3, 2010, she began arguing with appellant about statements he made about her mother and deceased father. Appellant then asked the children if they "had his back," and one of the children responded in a negative manner and appellant allegedly became enraged and charged toward the child. Brandy testified that after she and the children retreated outside, appellant attempted to hit her with a bat. According to Brandy, another one of her children, a ten-year old boy, jumped on appellant, and appellant threw him against a vehicle and punched him two times in the face. Brandy and the children escaped by getting a ride from a passer-by. Brandy's son managed to call 911.

Deputy Justin Smith with the Johnson County Sheriff's Office testified that he was the first officer to respond to the 911 call. When he arrived, he saw appellant run out of the house yelling threats and obscenities. Deputy Smith stated that appellant also threw pole-like objects at him.

Deputy Smith described appellant as "very hostile, very aggressive, running towards me, using profane language towards me and such." Deputy Smith elaborated

2

that appellant stated he was "going to kick [his] rear end, basically things like that." According to Deputy Smith, appellant said, "he would put one in between [his] eyes . . . ." and "he would make [Deputy Smith's] mom wish [he] was never born . . . ." When the State asked whether he believed appellant was capable of carrying out his threats, Deputy Smith replied, "With those threats, I mean, to me that's, you know, he's going to try to shoot us or, you know, use some type of deadly force against us."

Deputy Smith testified that appellant eventually stated that he was going to get a gun and then ran back into the home. The other officers then arrived at the scene, including Deputy Jared Fuller. Deputy Fuller drove his vehicle to the back of the residence to secure the perimeter. According to Deputy Smith, the following occurred:

> As [Deputy Fuller] gets around back, the front window [of appellant's residence] was wide open. There was nothing blocking the view through the house. You could see [appellant] walking around. And then right around the time Fuller gets around back, I see [appellant] running out the back door. And I get on the radio, advise Deputy Fuller he's running towards the back. And then at that time we start making our way towards the back. And you hear Deputy Fuller yelling, "Drop the weapon, drop the weapon, drop it now." And then we heard a loud pop.
>
> . . . .
>
> I saw Deputy Fuller by his patrol car. I saw [appellant] laying on the ground moaning. At that point, I walked over to him. . . . I reholstered my weapon. And that's when I secured [appellant] in handcuffs. There was also a—one of the—there was a weapon there, a bat or something, that he had came at Fuller with. And I just grabbed it and threw it out [of] the way so it wouldn't be in his proximity.

Appellant was taken to the hospital with a gun-shot wound. Deputy Smith went to the hospital. The State asked, over appellant's objection, "When you were at the hospital with [appellant], did he make any statements or comments to you?" Deputy Smith replied, "Yes, sir. . . . He made the statement that whoever shot him, the Aryan will know."

3

The trial court then admitted a copy of the video taken on the day of appellant's arrest by Deputy Smith's in-car video recorder. A portion of the video was then played in open court.

Deputy Fuller testified that he was dispatched to the scene of the family disturbance. According to Deputy Fuller, after hearing the "radio traffic," he believed that Deputy Smith was being assaulted with a weapon. Deputy Fuller stated that when he arrived at the scene, he was told that appellant had a weapon. Deputy Fuller was asked to secure the back of the residence, so he positioned his vehicle at the rear of the residence to secure any possible exits. Deputy Fuller explained:

> I had been told that—or I heard over the radio that the subject had a gun and he was coming out the backside of the residence. This—coming around the residence, my driver's side of my patrol vehicle was facing the residence. So, if somebody came out the residence with a firearm and started putting rounds at my patrol vehicle, would not give me much cover. So I immediately spun my vehicle in a [sic] 180 degrees to put some metal in between me and any rounds coming down range at me. Upon putting my vehicle in park, I rolled out the driver door and positioned my shotgun at the back door of the residence.
>
> . . . .
>
> I was right at the back door, I believe, because I remember hearing the radio traffic and I became very frightened.
>
> . . . .
>
> Well, as I was—positioning my patrol vehicle, I observed the back door open. I exited my patrol vehicle and took aim at the back door and began giving the male subject at the back door verbal commands.
>
> . . . .
>
> Well, I observed that he had an object in his hand which I believed to be a weapon. And at first being told that he had a firearm, I began giving him commands to drop the gun, drop the gun, drop the gun. And it basically just became a shouting match between us. I continued telling him drop the weapon, drop the weapon, drop the weapon. And he refused to comply.

4

. . . .

> We exchanged yells, and he approached me in a very rapid manner. And I continued giving him verbal commands . . . . None of which were heeded. And I believed that I was going to be assaulted with said weapon which is made to cause serious bodily injury or death, and I discharged one round from my Remington 870 shotgun into the subject's chest.

According to Deputy Fuller, the entire episode occurred very fast. On cross-examination, he agreed that it occurred within several seconds. A portion of the tape recorded on Deputy Fuller's in-car video camera was played for the jury.[2]

Deputy Fuller clarified that while appellant ran at him, he soon realized that appellant's weapon was not a gun. Deputy Fuller thought at the time that the weapon was a machete or a similar type weapon. Deputy Fuller stated, "Well the entire time he came straight at me at a dead run. No matter where I moved, he changed his direction straight at me. So the more I moved, the more he changed his direction until I ran out of, you know, ran out of room and I had no—no—I'm sorry, I had nowhere else to go." Deputy Fuller later explained that appellant was running at him at a "dead sprint" and that "it would be an imminent collision point no matter where [he] went because [appellant] continued changing the direction directly at [him]. So no matter where [Deputy Fuller] went [appellant] continued to run and [kept] going through [Deputy Fuller], [appellant] would have ran right over the top of [him]." On cross-examination, Deputy Fuller explained that he was attempting to retreat from appellant, but that he also had to ensure that the public was safe. Deputy Fuller stated, "And I don't know if it makes sense to you, but when you're trying to get away from something or someone

---

[2] The record shows that although the tape was approximately an hour and a half long, only seven minutes were played.

5

that you know is about to hurt you, you'll do anything you possibly can to protect yourself . . . ."

Deputy Fuller testified that when he shot appellant, he believed that appellant was about to strike him in the head with the weapon. Deputy Fuller stated that he was in a squatting position preparing to be hit with the weapon when he shot appellant. On cross-examination, Deputy Fuller elaborated, "I just hunkered down. I squatted straight down. I was still on my feet. I just bent my legs and squatted and got as low as I could possibly go." Deputy Fuller demonstrated appellant's stance for the jury, stating, "If I'm directly in front of him, he had gone from a running position such as this, reared back with the instrument over his head and was in a downward swing. So he was right about here." On cross-examination, Deputy Fuller stated:

> At first I didn't know what a man running directly at me with a weapon in his hand was doing with a person pointing a loaded weapon at him. During the course of his running straight at me, he would take a hopping crow step, rear back. I would duck as I was continuing to retreat backwards. And then he would just continue running. It's like he would almost not miss a beat. He was running, would take a crow step, rear back, and then just start running when I ducked behind my car.

Deputy Fuller realized after he shot appellant that the object appellant used was a club, and he believed the object "would have seriously hurt [him]." Deputy Fuller expected to be struck by the club even after he shot appellant. On cross-examination, Deputy Fuller stated, "[B]y the time I shot him, I believe he was going to crack my skull wide open with [the club]."

Deputy Fuller identified State's exhibit 12 as the object wielded by appellant. Deputy Fuller said, "This club is capable, designed and fashioned as a weapon. It's a blunt instrument that is meant to inflict bodily injury, serious bodily injury or death."

6

Deputy Fuller believed that the sole purpose of the object was to inflict harm to somebody.

Deputy Fuller stated that he was relieved when he arrived at the scene and discovered that Deputy Smith had not been injured. When asked what was "going through" his mind as appellant was approaching him, Deputy Fuller responded:

> Well, it was kind of a surreal experience, but I remember the thoughts keep going around and around in my mind, "I don't want to do this, I don't want to do this, I don't want to do this, I don't want to be here." And then, "This is going to happen." And I discharged my firearm, and as soon as my mind reset, the first thing went through my mind is, "That just happened." And then I completely reset, ejected the spent cartridge out of my firearm, racked a new one in, and continued giving verbal commands to [appellant].
>
> . . . .
>
> I just didn't want to shoot him. I didn't want to kill anybody that day. You know, one, you never really want to kill anybody, and you try to prepare yourself for it . . . .
>
> . . . .
>
> I was in fear that I would be killed, seriously injured or maimed. I was afraid that I wouldn't see my children that night.

On re-direct examination, Deputy Fuller described his state of mind as follows: "Immediately after I was, I believe, in shock. I was in fear, and I remained in shock for approximately three days before everything came full circle and actually hit and set in. . . . I was afraid before I pulled the trigger." When asked why he felt like appellant was threatening him with imminent bodily injury, Deputy Fuller replied:

> Well, the call itself was already reported as violence, and somebody that will harm family members will not hesitate to harm others. It's your job to get there, separate and detain. And, you know, the fact that assault's already been recorded or reported, felony assault at that. The subject approaches me, who is slightly bigger and armed with a weapon, and already irate, made verbal statements to kill me. I believe still to this day I have no doubt in my mind that he intended to kill me.

7

. . . .

His intentions at that time were to cause me serious bodily injury.

Wayne H. Lewis, appellant's unrelated neighbor, testified that he observed Deputy Fuller's vehicle enter appellant's back yard and heard someone ask appellant to come out of the residence with his hands up. Lewis explained:

Then when the officer stopped his car and opened the door, a man run out the back door. And like I say, I was like, I don't know where he can go. There's nothing but fence there. But as he ran, the deputy moved to the back of the car, and then the man made a left turn, headed right for him, so he was headed right for the officer the whole time.

. . . .

When [the officer] got out of the car, he stepped out and grabbed his shotgun and looked up. And the man was running after him, so he moved to the back of the police car right there and took a stance on the—at the back of the car and hollered for him to stop.

. . . .

And that's when the Defendant made a left curve running at the officer. So he was—looked to me like he was going to run around this side to get him at first, but then when he retreated back here he made a left.

Lewis stated that he had no doubt that appellant was "going after the deputy." Lewis saw Deputy Fuller shoot appellant. According to Lewis, if Deputy Fuller had waited another second to shoot his weapon, appellant "would have been all over him." Lewis testified that the entire episode was "[p]retty quick" and appellant was at a "dead run." Lewis could not tell whether appellant had anything in his hands.

Anthony Bradford, a Texas Ranger, testified that he investigated the shooting. Ranger Bradford stated that based on the investigation, the department concluded that "Deputy Fuller reasonably believed that the force he used was immediately necessary to defend himself from serious bodily injury or death." Ranger Bradford believed based

8

on his training and experience that Deputy Fuller's use of force in this case was justified. According to Ranger Bradford, based on his review of the evidence, he would not have waited as long as Deputy Fuller did to shoot appellant. When the State asked if, based on his experience and training, he believed that Deputy Fuller was in imminent fear of bodily injury when he discharged his weapon, Ranger Bradford replied, "I think any reasonable person that watches the video will come to that conclusion. That's not based on any training I've had." Ranger Bradford agreed that the object that appellant allegedly used during the episode with Deputy Fuller was capable of causing death or serious bodily injury to an individual.

Arthur L. Raines, M.D., a former medical examiner, testified that he is a pathologist and has a medical license to practice in California and Texas. After inspecting the object that appellant allegedly used during the incident with Deputy Fuller, Dr. Raines opined that the object could be used as a deadly weapon. When asked if the object could cause a deadly blow, Dr. Raines said, "Yes, sir, especially if they struck them on the side of the head and on the side of the skull." Dr. Raines stated that in his opinion the object was a deadly weapon.

## II.    LEGAL SUFFICIENCY

By his first issue, appellant contends that the State failed to prove that appellant "placed [Deputy] Fuller in imminent danger." Specifically, appellant argues that he was six to eight feet away and not holding a gun; therefore, he was not a real threat to the person he was approaching. We construe appellant's argument as challenging whether he threatened Deputy Fuller with imminent bodily injury. *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b)(2)(B), (c); *see also id.* § 22.01(a)(2).

### A.    Standard of Review and Applicable Law

9

In a sufficiency review, we examine the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010). The fact-finder is the exclusive judge of the facts, the credibility of witnesses and of the weight to be given testimony. *Brooks*, 323 S.W.3d at 899. We must resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A person commits aggravated assault when he commits assault as defined in section 22.01 of the penal code while using or exhibiting a deadly weapon. TEX. PENAL CODE ANN. § 22.02(a)(2). A person commits assault as defined in section 22.01(a)(2) if he intentionally or knowingly threatens another with imminent bodily injury. *Id.* § 22.01(a)(2). Aggravated assault is a first-degree felony if the actor commits the offense against a person the actor knows is a public servant while the public servant is discharging an official duty. *Id.* § 22.02(b)(2)(B). If the person was wearing a distinctive uniform or badge, the actor is presumed to have known the assaulted person was a public servant. *Id.* § 22.02(c).

**B.    Analysis**

Here, Deputy Fuller testified that he attempted to retreat from appellant, but appellant continued chasing him until Deputy Fuller was unable to get away from appellant. According to Deputy Fuller, appellant refused to heed Deputy Fuller's commands to drop his weapon. Deputy Fuller said that appellant ran at him at full

10

speed with a club in his hand and did not stop until he shot appellant. Evidence was presented that when appellant charged at Deputy Fuller, he raised his arm and appeared to be preparing to strike Deputy Fuller with the club.

Deputy Fuller stated that he was in fear for his life and believed that appellant would strike him in the head with the club. Deputy Fuller said that he "hunkered down" in anticipation of being hit with the club. Deputy Fuller thought that appellant was going to strike him even after he shot appellant. Deputy Fuller was afraid that appellant would kill him and that he would not go home to his children that night. Deputy Fuller believed that appellant was about to assault him with the club because the situation involved a family disturbance, appellant had already assaulted his family member, appellant approached him with a weapon, appellant was irate, and appellant stated that he would kill Deputy Fuller. Deputy Fuller had no doubt that appellant intended to kill him with the club.

Lewis had no doubt that appellant was "going after" Deputy Fuller. Lewis stated that had Deputy Fuller waited another second to shoot appellant, appellant would have "been all over him." Ranger Bradford determined that "Deputy Fuller reasonably believed that the force he used was immediately necessary to defend himself from serious bodily injury or death," and concluded that the use of a shotgun was justified in this case. Ranger Bradford stated that a reasonable person who viewed the video of the incident would conclude that Deputy Fuller was in imminent fear of bodily injury when he discharged his weapon. Evidence was presented that the club was capable of causing serious bodily injury or death.

After viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable fact-finder could have found that appellant threatened Deputy Fuller

11

with imminent bodily injury.  *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898–99.  Thus, the evidence is sufficient.  We overrule appellant's first issue.

### III.  EXCLUSION OF VIDEO EXCERPT

By his second issue, appellant contends that the trial court abused its discretion when it did not allow him to publish the entire video tape recorded by Deputy Fuller's in-car video camera.  Appellant states that although the video was admitted in its entirety, only an excerpt was played in open court.  Thus, appellant argues that the trial court erred by denying his request to play the entire video under the rule of optional completeness.  *See* TEX. R. EVID. R. 107 ("When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.").  In the alternative, appellant argues that because the video was admitted "for all purposes," the trial court had no discretion to play only a portion of it in open court.

At trial, appellant did not request that the trial court play the entire video pursuant to the rule of optional completeness.  Therefore, this issue has not been preserved for our review.  *See* TEX. R. APP. P. 33.1 (requiring that the party state the grounds for his objection in order to preserve a complaint for appellate review).

Next, appellant claims that the trial court had no discretion concerning whether to play the entire video.  Appellant points to no authority, and we find none, requiring a trial court to play the video in its entirety if the trial court determines it is not relevant.  Nonetheless, at trial, after the State played the portion of the video capturing appellant's

12

actions and the shooting, appellant asked for the remainder of the video to be played. The trial court asked appellant to explain the relevance of a video of events occurring after the shooting. Appellant stated that the video would show inconsistencies in Deputy Fuller's testimony regarding whether he believed that appellant had a machete. Appellant argued that Deputy Fuller testified that after the shooting he realized that appellant had a club and not a machete, but that on the video, it appears that Deputy Fuller believed it was a machete even after the shooting occurred. The following exchange then occurred:

| | |
|---|---|
| [Trial Court]: | Okay. How about this? And I'm asking at this point. Would it make since [sic] or be acceptable to the Defense to reserve the right to request to play the rest of this tape at a later point after some evidence has come up that puts something in a relevant time frame. |
| [Trial Counsel]: | Absolutely, because I could just reserve him subject to recall. |
| [Trial Court]: | I mean, let's assume that other testimony from the State's witnesses cast further shadows on some event or diagram or crime scene or—and you wish to show that, show the inconsistency, at that point, could you recall this deputy at that point? |
| [Trial Counsel]: | Yes, I could recall him. |
| [Trial Court]: | Would that be acceptable to you as opposed to doing it first thing in the morning? Because I'm not sure that you'll—you know, I would have to see from the other witnesses why that becomes relevant. In the meantime, I would be happy to listen to the audio outside the presence of the Jury. I can listen to it tonight if I need to. |
| [Trial Counsel]: | Again, yeah, I would—I think I'm going to request— I'm going to have to request that we play it in its entirety at some point, but I can certainly—there are some photographs I believe I would like to introduce at some point that might—that would conflict with his diagram here and his perception of the events as they |

13

are.  And I think that as a whole coupled with his story that he told either today and back right after the event occurred, I think it's something that's—I think it's something the Jury ought to consider.  I think they ought to have the opportunity to consider all that.  This is a first degree felony offense and—

. . . .

[Trial Counsel]:      I'll reserve my right to call him at a later point in time, and I'll let the State proceed with their case and these issues—

[Trial Court]:        Are there any other questions you wish to ask him tomorrow morning other than playing the other hour and a half of the video?

[Trial Counsel]:      There might be a few.  I've got a few.

[Trial Court]:        Do you want to think about it and let me know in the morning?

[Trial Counsel]:      All right.  That's fine.

[Trial Court]:        And think about if you want to raise your argument to play the audio in the morning, and I'll think about it overnight, and then I'll listen to that argument when I'm fresh in the morning as opposed to right now.

[Trial Counsel]:      That's fine.  And if you want to take the video and listen to the rest of it, you can, but I feel like that's something that needs to be played because it happened so—it happened right after the event occurred, and I believe a man's statements right after the event occurred are going to be more accurate.  And if there are any inconsistencies, I think the Jury ought to be able to consider that as well.

[Trial Court]:        Yeah, I understand.  The inconsistency that I think would be relevant is that he says, well, he was—if it turned out he wasn't charging the deputy or wasn't running at the deputy or I had no weapon at all, but an inconsistency with the perception of what the weapon was as opposed to what it turned out to be doesn't really make much sense to me.  And there's nothing in the testimony so far to suggest that your client did anything other than charge the deputy, charge at the

14

> deputy with something in his hand that turned out to be a stick instead of a machete or a gun, but there's nothing to say that he didn't charge your client—your client didn't charge the deputy. So the inconsistent statement might be it was a machete instead of a stick, turned out to be a stick. Well, that's still a Jury question for the Jury to decide whether or not the object that your client had was being used in a manner that makes it a deadly weapon.
>
> That's what I want you to think—we're tired and I'm tired. And think about that tonight, and in the morning I'll look at it fresh with an open mind and try to see, see what your objections might be and what your position might be on that, but . . . .

[Trial Counsel]:     Okay. . . .

Appellant did not make another request to play the video.

Appellant stated that the trial court could reserve ruling on his request to show the entire video until the next morning and agreed that he would re-urge his request then. Appellant failed to do so. Under these circumstances, we conclude that appellant has failed to preserve error, if any, because he did not obtain a ruling from the trial court on his request to play the entire video.[3] *See* Tex. R. App. P. 33.1(a). We overrule appellant's second issue.

## IV.    EVIDENCE OF MEMBERSHIP IN THE ARYAN BROTHERHOOD

By his third issue, appellant argues that the trial court improperly allowed evidence of his alleged membership in the Aryan Brotherhood. Appellant argues that evidence of membership in a gang constitutes an extraneous offense prohibited by rule

---

[3] We note that appellant argues on appeal that the video portion not played in court was relevant because it "contained statements from Deputy Fuller regarding his belief of imminent danger and his need to use deadly force against Appellant." However, appellant did not make this argument to the trial court. Therefore, it has not been preserved for our review. *See* Tex. R. App. P. 33.1(a). Appellant makes no other argument regarding how the video was relevant.

15

404(b) and that in this case no exception to rule 404(b) allowed its admission.[4] *See* TEX. R. EVID. 404(b) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

In *Jaynes v. State*, this Court concluded that status as a member of the Aryan Brotherhood is not evidence of a crime, wrong, or act as contemplated by rule 404(b). 216 S.W.3d 839, 849 (Tex. App.—Corpus Christi 2006, no pet.). Thus, rule 404(b) did not prohibit admission of evidence of appellant's alleged status as a member of the Aryan Brotherhood. Accordingly, we overrule appellant's third issue.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
22nd day of March, 2012.

---

[4] The State argues that appellant failed to preserve his complaint for our review because he merely objected on the basis that evidence concerning the Aryan Brotherhood was not relevant. However, appellant also argued that it concerned an extraneous matter.