NUMBERS

13-10-00427-CR

                                                13-10-00428-CR


                                                

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



DON STONE,                                                                                  Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

 

 



On appeal from the 130th District
Court

of Matagorda County, Texas.

 

 



MEMORANDUM OPINION

 

Before Chief Justice Valdez and
Justices Rodriguez and Garza

Memorandum Opinion by Chief Justice
Valdez

            Appellant, Don Stone, was convicted of
one count of aggravated sexual assault of a child, one count of indecency with
a child by contact, and one count of indecency with a child by exposure.[1]  See Tex. Penal Code Ann. §§ 21.11(a)(1),
(a)(2)(A), 22.021(a)(1)(B)(i) (West Supp. 2010).  Stone was sentenced to three
life sentences to run concurrently.  By four issues, Stone contends that the
evidence is legally insufficient to support his conviction and that the
convictions for indecency with a child violate the constitutional prohibition
against double jeopardy.  See U.S.
Const. amend V.  We affirm the judgment in appellate cause number
13-10-00427-CR, and we modify the judgment in appellate cause number 13-10-00428-CR
and affirm as modified.

I.          Background

            Stone lived in Bay City, Texas with
his common law wife, A.P., who had a daughter, T.P. and a granddaughter, T.S. 
A.P. and Stone sometimes cared for T.S. and T.S.’s brother, “Papa.”[2]  In February
2009, T.P. went to visit friends in Las Vegas, Nevada, and she left T.S. with
Stone and A.P.[3] 
After returning from Las Vegas, T.P. moved to Houston, Texas sometime at the
end of February or beginning of March; however, she left T.S. with Stone and
A.P. because T.P. wanted T.S. to finish out the school year in Bay City.  T.P.
took Papa with her to Houston.  T.S. moved to Houston to live wither her
mother, T.P., at the end of May.

While living in Houston,
T.P. caught T.S. viewing a “cartoon” on her computer of people engaged in
sexual activity.[4] 
T.P. testified that she told T.S. to go to bed and that they would discuss the
cartoon in the morning.  T.P. stated that the next morning, she told T.S. that
she was not supposed to watch those types of cartoons on the computer and asked
T.S. why she was watching it.  T.S. replied that she did not know why.  T.P.
then told T.S. that the computer would be taken out of T.S.’s room and that
next time, she would “whoop” T.S.  According to T.P., she gave T.S. a hug, and
T.S. started crying.  T.P. stated that she asked T.S. why she was crying and
that T.S “just looked down at the ground.”  T.P. testified that she went about
her business, and T.S. then told her, “Mama, you know that nasty you caught me
watching? . . . [Stone] watches that.”  T.P. asked T.S. how
she knew that Stone had pornographic movies, but T.S. would not answer and
“just looked down at the ground.”

T.P. called her sister,
Tasha, and asked her to talk to T.S.  T.P. did not hear what Tasha said to
T.S.  T.P. then had another conversation with T.S.; however, T.P. asked
questions “[o]ver a period of days.”  According to T.P., T.S. told her that
Stone “put his hand inside of her.  Then she said that he would take his thingy
and put it in his hand and put it inside of her.”[5]  T.P. elaborated
that:

When it first—when I asked her about when they were staying
at [A.P.’s], because when—not [A.P.’s], but [A.P.] was staying at 2314 Avenue A
because she moved in pretty much right after I left and went to Houston.  And
[T.S.] said that that’s when she—when he would come, you know and pretty much
that that’s when he put his hand inside of her.  And she said it hurt and that
she had to go to the bathroom and she was bleeding.  And this was like
recent—more recent because this is after [A.P.] moved from the other location
by the old [high] school.  You know she was staying there before she moved to
[Avenue A].

 

T.P. continued:

At that location [Avenue A] she said he just had used his
hand pretty much and that that’s when he would get her out of bed and lay her
on the couch with him to watch the porno.

 

            When
they were staying at the other location [by the old high school], that’s when
she said he actually took his thingy and, you know, put it inside of her.  But
he didn’t—he had it in his hand she said, and he put it inside of her that way.

 

T.P. claimed that T.S. said that Stone threatened that
if T.S. ever told anyone what he was doing to T.S., he would hurt T.P. and A.P.

T.P. called the police in
Houston to report what T.S. had said.  However, because the events allegedly
occurred in Bay City, T.P. filed a police report there.  T.P. then took T.S. to
the children’s assessment center where she was examined by a doctor.  T.S.
stated that T.P. told the doctor what Stone had allegedly done to her.

On redirect examination,
T.P. testified that T.S. said that Stone would watch pornographic movies with
T.S.  According to T.P., T.S. said “that when [T.P. was living in Houston,
T.S.] would be in the bed with [Papa] sleeping, [and Stone] would come get her
out of the bed and come lay her on the couch and have her watch the
[pornographic] movies with him” in the living room at the Avenue A residence. 
When asked if T.S. ever mentioned anything about semen, T.P. acknowledged that
T.S. did not know that term but had “said the clear stuff that comes out.  And
[T.S.] said that it tastes salty.”  T.P. testified that T.S. told her that the
“clear stuff” came out of Stone’s “thingy when they were at the residence by
the old high school.”

T.S., an eight-year-old
child, testified that when she was at A.P.’s house, Stone “was trying to do
nasty stuff with [her].  He was trying to do stuff that parents do.”  T.S. said
that Stone would call her to the living room or to A.P.’s room and “[h]e was
trying to get his thing and try[ing] to put it in [hers].”  T.S. said that
Stone attempted to remove her clothes, but that she would not let him do so. 
According to T.S., Stone asked her to take off her clothes, he would take off
his clothes, and she would lie on her back in the bed.  T.S. stated that when
she was with Stone in A.P.’s room, he would not remove his shirt and only
removed his pants.  T.S. testified that Stone would then “try to get his private
and try and to put it on my back. . . .  No, on my—my
bottom.”  T.S. later clarified that Stone “would try to get his private” in her
“private.”  T.S. stated that Stone “tried” to put his private in her private “a
lot” in the living room and in A.P.’s bedroom.  When asked what she saw, T.S.
replied, “Got his private and trying to put it inside of it.”  T.S. explained
that when Stone did this to her, it “[h]urt bad” and that Stone was between her
legs.  T.S. also stated that Stone “was trying to put [his private] in [her]
mouth” and that “that clear stuff” came out of his private.  T.S. remembered
that on one occasion, “that clear stuff” “squirted in [her] mouth” and she
tried to spit it out.  T.S. explained that “that clear stuff” tasted “nasty.” 
T.S. testified that she “tried” to tell Stone to stop because she knew that he
“was trying to do something that was bad. . . .”

The State asked, “[W]hen
he would put his private in your private, it would hurt,” T.S. replied, “Yes”
and stated that she would tell Stone that it hurt but that he would not stop.  T.S.
testified that Stone also tried to put his hand in her private.  T.S. explained
that this happened when she was six and then also when she turned seven.  She
said, when I turned seven, “he’s still doing it.”  When asked if he ever put
anything else besides his hand or private into her private, T.S. said, “Yes. 
His mouth.”  T.S. explained that Stone was “trying to lick [her
private] . . . .” and she would tell him to stop but he
would not stop.  T.S. testified that sometimes after Stone “was trying” to put
his private in her private, her private would hurt and that she saw blood when
she went to urinate.  The State asked if these “things happened all the time,”
and T.S. replied, “Yes.”  T.S. claimed that Stone told her that if she told
anyone what he was doing, “[h]e would do something bad to [her].”

According to T.S., Stone
committed these acts while T.P. was in Las Vegas and also when T.P. was in
Houston with Papa.  When asked how often it happened when T.P. was in Houston,
T.S. replied, “Like, a lot of times.”  T.S. also claimed that Stone had sexually
abused her when he visited her in Houston after she turned eight.

Marcella Donaruma, M.D.,
testified that she examined T.S. after T.S. made an outcry.  Dr. Donaruma
stated that T.S. had dysuria, or the medical term for “it hurts when I pee” and
vaginal discharge.  Dr. Donaruma clarified that although T.S. had discharge,
she did not have any sexually transmitted diseases.  After acquiring T.S.’s
past medical history from T.P., T.P. left the examination room, and Dr.
Donaruma interviewed T.S. alone.  Dr. Donaruma testified that she asked T.S. if
she had been touched “in a way that a kid should not be touched on your private
places,” and T.S. replied, “Someone touched me everywhere in my private places.” 
When Dr. Donaruma asked what places, T.S. said, “My behinney, my stomach, and
his name is [Stone].”  Dr. Donaruma stated that she asked T.S., “What did he
touch your places with,” and that T.S. said, “His hand and his thingy.” 
According to Dr. Donaruma, T.S. described Stone’s thingy as being “short” and
having “a straight line in the middle and the clear stuff would come out.” 
T.S. clarified that the “clear stuff” came out of Stone’s “thingy.”  Dr.
Donaruma testified that T.S. said, “He put his thingy in me, and it really
hurts” and “Where I pee, there is blood coming out.”  T.S. told Dr. Donaruma
that she saw blood “when she was gonna flush the toilet” and then pointed to
her private area and said, “My thingy hurts.”  Dr. Donaruma stated that she asked
T.S. how many times Stone touched her thingy with his thingy and that T.S.
responded, “A lot.”  T.S. allegedly told Dr. Donaruma that Stone asked T.S. to
touch him and that after she touched him, she washed her hands.  T.S. said that
Stone showed her “nasty movies . . . where people are
naked.”  Dr. Donaruma ended the interview at this point.

Dr. Donaruma testified
that there is a difference in the description of events between a child who has
merely viewed pornography and a child who has been sexually abused.  Dr.
Donaruma stated:

Well, a child who’s describing pornography does not
typically throw in the additional detail saying I can feel what it feels like
and then not only describing that it does hurt but also when it hurts and then
describing that there’s blood and then not only that there was blood but when
she noticed it.  That’s the type of really rich detail that adds a lot of
credence to her disclosure. . . .  And when she went
to flush the toilet, there was the blood and her thingy was hurting then.  So,
she’s relating that pain to the bleeding to what happened.  It’s multiple
levels of association that make this a very detailed disclosure.

 

Dr. Donaruma testified that she believed that T.S.’s
description of the events was credible.  Dr. Donaruma explained that “it was
clear” what T.S. meant by “his thingy,” and Dr. Donaruma interpreted the
contact as penile/vaginal contact because T.S. pointed to where her “thingy
was.”

            Dr. Donaruma then conducted a physical
examination of T.S.’s genital area.  Dr. Donaruma testified that T.S.’s hymen
“looked great” and that “[e]verything was there that should be there.”  Dr.
Donaruma noted that there was vaginal discharge “pooling” in the vagina and
some skin irritation.  Dr. Donaruma explained that the irritation probably
occurred due to the vaginal discharge; she said, “When you put discharge on
skin and then put underpants on top of that, it’s very irritating to the
skin.”  Dr. Donaruma stated that the irritation was not indicative of sexual
abuse and was more likely related to the discharge and a urinary tract
infection.  At the end of the examination, Dr. Donaruma informed T.S. that she
could not “tell by looking that anything happened” and that meant T.S.’s “body
was healthy.”  Dr. Donaruma, however, did recommend that T.S. receive sexual
abuse counseling.

Later, Dr. Donaruma
explained that she had examined a fifteen-year-old girl who had just had a
seven-pound baby, and she could not “tell by looking at her she ever had sex[,]
let alone delivered a baby.”  She further stated that it was not true that one
would expect to find medical evidence that a child has been sexually
assaulted.  When asked if the physical exam led Dr. Donaruma to the conclusion
that T.S. had been sexually abused, she stated:

That’s a hard question to answer. . .
.  Well, what we know now that this specialty has existed between 20
and 30 years, depending on when you decide to choose the best paper, is that
more than 90 percent of children and in some cases even up to 95 percent of
children even before and after puberty have no signs of penetration when they
describe what we would perceive as penetrating events.  So, what we know is
that it’s normal to have a normal body even after something has happened to
you.  More importantly, I think is that the body down there is so rapidly
healing.  It’s like the skin inside your mouth.

 

            On
Super Bowl Sunday, if you cut your mouth on a nacho, by Tuesday or Wednesday
you’re not going to have that cut in your mouth anymore.  That’s the same skin
that’s in the vagina.  It heals very quickly.  So, it’s unlikely for us to find
injury in both cases.  So, we just try to do the best we can to make sure we’re
not missing that 5 to 10 percent of kids who are going to have anything to see.

 

Dr. Donaruma also opined that she did not believe
that ninety to ninety-five percent of children were lying when they claimed
sexual abuse.  She stated that based upon studies:

The younger children—in general it’s very rare for a child
to make this up and to continue to make it up to multiple audiences with
additional interventions happening after they make these disclosures.  Younger
children are even less likely to be fabricating things.  Above the age of 12
and 13, it’s more likely.  But what is more likely is for minimization to
happen rather than exaggeration.  And even then it’s still less than 20 percent
of cases.  The numbers are running away from me.  I think it 13 to 15 percent
of cases are fabricated or not related in the way to the perpetrator confessing
that they happened.

 

            On cross-examination, Dr. Donaruma
testified that she did not tell T.P. that her physical exam of T.S. “showed
sexual abuse.”[6] 
Dr. Donaruma stated that she “would have said I just don’t know yet.”  Dr.
Donaruma explained that when she finds trauma in the hymen, “most often that’s
in acute assault, so a freshly assaulted body . . . .  When
things are more remote in time, unless there’s a piece of tissue missing, it’s
very rare to find anything.”  Dr. Donaruma agreed that children who have not
been sexually abused can suffer from urinary tract infections and that “having
a urinary tract infection or some type of vaginal infection is not conclusive
that there has been sexual abuse.”  According to Dr. Donaruma, “the best
evidence that sexual abuse has occurred is a clear and consistent disclosure
from the child.”

            On redirect examination, Dr. Donaruma
stated that she found the physical exam to be indeterminate of sexual abuse but
that T.S. was able to give a clear and consistent description of what
happened.  When asked why Dr. Donaruma concluded that the examination was
indeterminate of sexual abuse, despite T.S.’s clear and consistent description
of events, Dr. Donaruma replied:

That’s a flaw in the paperwork.  So, I often just—right
away I just type in stuff that I want to express in situations such as these. 
If you see our chart, it’s boxes.  And I check 13 pages of boxes.  And, so,
what we do is we can check normal exam which means that the body is normal,
normal variance, findings caused by medical condition indeterminate, which I
checked, and findings of diagnostic of trauma or sexual contact.  None of these
speak to the content of the interview.  It’s a box checking flaw we have here.

 

            And,
so, what I typically will write, which I didn’t have the, I guess, foresight to
do here because I didn’t know what to make of the discharge was that even with
a normal exam, which is what we most often see, I’m not saying I think abuse
never happened.  I don’t describe myself as a lie detector or not.  But what I
say is that there’s nothing acute or chronic on the anatomy of her exam.  That
does not mean that she is not telling me the truth.  And what I would say is
that I don’t expect to see any residual to the contact she described on her
exam based on what she told me, and there’s no box to check that explains I’m
actually integrating the interview with the physical exam.

 

When asked if T.P. could have had the impression
that the exam showed that T.S. had been sexually abused, Dr. Donaruma said:

What I say to parents is her body looks totally normal. 
That doesn’t mean I think—that doesn’t mean I don’t believe anything happened. 
But there’s nothing left—what I would say is there’s nothing left behind from
what she’s telling, but that’s good news for her.  So, I don’t say, oh, it’s
normal.  This is all made up.  I just say we’re lucky her body is healthy and
normal.

 

            . . . .

 

So, I’m sure [T.P.] heard that because I do believe
[T.S.’s] disclosure.

 

            A.P. testified for the defense.  A.P.
stated that T.P., T.S., and Papa have lived with her at various times. 
According to A.P., she and Stone lived at 12th Street and then moved to Avenue
A, A.P.’s parent’s home.  A.P. testified that T.P. lived with her approximately
for one month before going to Las Vegas and that T.P. went to Las Vegas in
January 2009.  According to A.P., she and Stone lived at the home on 12th
Street when T.P. went to Las Vegas.  The home on 12th Street was located
“across the street from the old high school.”

A.P. stated that she did
not witness anything that would cause her to believe T.S.’s allegations.  A.P.
did not believe the allegations against Stone because she had been with Stone
for ten years and “he’s never had a charge like this on him before.”  However,
when asked if she thought T.S. was lying, A.P. stated, “I don’t believe—well,
I’m going to put it this way:  Some of it I don’t believe—some of it I don’t
believe she’s lying about, and some of it I do believe she’s lying about.” 
When asked to clarify, A.P. replied:

Well, my granddaughter’s, she’s a very good little girl;
and I know I’ve spoiled ‘em both a lot.  I have.  Because everything they
usually ask for I try to get it for ‘em, for both of ‘em.  But—and I’ve never
ever see [Stone] mess with her, with my granddaughter, never.  He spent time
with ‘em, play with ‘em.  They’ll come in and say, [Stone], come in and play
with us.  And he’ll go in there and play with them.

 

A.P. testified that she
did not have any pornography in her home and that she did not allow Stone to
bring any into the home.  A.P. did not witness Stone watching pornographic
movies alone or with the children present and she did not notice Stone missing
from the bed at night.  According to A.P., Stone treated the grandchildren
“very well,” and he “would take time, you know, make sure that they had food to
eat or cook for them.”

On cross-examination, the
State asked, “Ma’am, so, you didn’t really answer [defense counsel’s] question
when you said some of it you believe and some of it you don’t believe.  So, I’m
interested in what it is about the allegations you believe?”  A.P. responded
that she believed T.S. “to a certain extent on some things she told” A.P.  The
State asked A.P. to repeat those things and A.P. replied, “Well, I’m just—I’m
going to tell it like it is because, okay, at first when [T.S.]—[T.P.] told me
about what happened—because she called me and when she told me about what had
happened, I did believe [T.S.].”  A.P. then stated, “But everything has been
changing.  You know, things—the story’s been changed three times.”  A.P.
refused to repeat the “things” that T.S. said Stone had done to her because it
was “very bad.”  A.P. acknowledged that she believed T.S. “at one point.”

A.P. testified that when
the police were unable to find Stone in order to interview him regarding T.S.’s
allegations, Stone was in California.  A.P. stated that a police detective
yelled at her because he claimed she would not disclose Stone’s location, but A.P.
insisted that she did tell the detective that Stone was in California. 
However, A.P. said that she did not have any information about Stone’s location
in California; and therefore, she was unable to provide that information to the
detective.  Instead, A.P. told the detective that Stone would call him.  Later,
A.P. stated that she called Stone and told him that he needed to come home due
to the investigation.  When asked if she gave the detective Stone’s phone
number, A.P. replied, “No, because I didn’t have the number because he called
me.”

After hearing the
evidence, the jury found Stone guilty of all three counts and sentenced him to
three life sentences to run concurrently.  This appeal followed.

II.         Sufficiency of the Evidence

            By his first, second, and third
issues, Stone contends that the evidence is legally insufficient to support the
verdict.[7] 
Specifically, Stone argues that the evidence is legally insufficient to support
the aggravated assault conviction because:  (1) the State failed to prove the
date that the offenses allegedly occurred; (2) T.S.’s testimony was too
general; (3) there was no evidence that “anything happened” because T.S.
“always used the words ‘tried’ or ‘trying’”; (4) there was no physical
evidence; and (5) “T.S. did not describe any identifying marks or the sexual
organ of [Stone].”  As to both counts of indecency with a child, Stone argues
that the evidence is insufficient to show that he had the intent to gratify
“anyone’s sexual desire.”  As to the second count of indecency with a child by
exposure, Stone argues that the evidence is insufficient because this count is
a lesser-included offense of aggravated sexual assault.

A.        Standard of Review and Applicable Law

            The court of criminal appeals has held
that there is “no meaningful distinction between the Jackson v. Virginia
legal sufficiency standard and the Clewis factual-sufficiency standard”
and that the Jackson standard “is the only standard that a reviewing
court should apply in determining whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove beyond a
reasonable doubt.”  Brooks v. State, 323 S.W.3d 893, 902-03, 912 (Tex.
Crim. App. 2010) (plurality op.).  Accordingly, we review Stone’s claims of
evidentiary sufficiency under “a rigorous and proper application” of the Jackson
standard of review.  Id. at 906-07, 912.  Moreover, we do not refer
separately to legal or factual sufficiency and will only analyze Stone’s issues
under the Jackson standard.  See id. at 985 (concluding that
there is no meaningful distinction between a legal and factual sufficiency
analysis).

Under the Jackson
standard, “the relevant question is whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Jackson
v. Virginia, 443 U.S. 307, 319 (1979); see Brooks, 323 S.W.3d at
898-99 (explaining that in the Jackson standard we consider “all of the
evidence in the light most favorable to the verdict,” and determine whether the
jury was rationally justified in finding guilt beyond a reasonable doubt).  “[T]he
fact[-]finder's role as weigher of the evidence is preserved through a legal
conclusion that upon judicial review all of the evidence is to be
considered in the light most favorable to the prosecution.”  Jackson, 443
U.S. at 319 (emphasis in original); see Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979) (“The jury,
in all cases is the exclusive judge of facts proved and the weight to be given
to the testimony . . . .”); Wesbrook v. State, 29 S.W.3d 103, 111 (Tex.
Crim. App. 2000) (“The jury is the exclusive judge of the credibility of
witnesses and of the weight to be given testimony, and it is also the exclusive
province of the jury to reconcile conflicts in the evidence.”).

We measure the legal
sufficiency of the evidence by the elements of the offense as defined by a
hypothetically correct jury charge.  Coleman v. State, 131 S.W.3d 303,
314 (Tex. App.—Corpus Christi 2004, pet. ref’d) (citing Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  A person commits the offense of
aggravated sexual assault of a child by intentionally or knowingly causing the
penetration of the sexual organ of a child by any means, and the child was
younger than fourteen years of age.  See Tex. Penal Code Ann. § 22.021(a)(1)(B)(i).  A person commits
the offense of indecency with a child if, with a child younger than 17 years of
age, the person “engages in sexual contact with the child or causes the child
to engage in sexual contact” or the person acts “with intent to arouse or
gratify the sexual desire of any person” and that person exposes the anus or
any part of the person’s genitals knowing the child is present.  See id.
§ 21.11 (a)(1), (2)(A).

B.        Analysis

1.         Aggravated
Sexual Assault

            By his first issue, Stone contends that
there was no evidence that “anything happened” because T.S. used the term
“tried” during her testimony.  At trial, T.P. testified that T.S. told her that
Stone put his hand inside of her, he put his “thingy” in his hand and then put
it inside her, and that T.S. saw “clear stuff” come out of Stone’s thingy. 
T.P. explained that T.S. said that Stone put his hand inside her when T.S.
lived with Stone and A.P. at the residence on Avenue A.  T.P. also claimed that
T.S. told her that when she stayed at the residence by the old high school with
Stone and A.P., Stone “actually took his thingy and, you know, put it inside
her”; T.S. allegedly also saw the “clear stuff” come out of Stone’s thingy.

T.S. testified that Stone
“was trying to get his thingy and try[ing] to put it in [her thingy].”  T.S.
stated that Stone would take off his pants and ask her to remove her clothes. 
T.S. claimed that Stone tried to get his private into her private “a lot” while
they were in the living room and in A.P.’s bedroom.  T.S. said that she saw
Stone attempt to get his private inside her.  T.S. testified that Stone also
tried to put his private in her mouth and that on one occasion, she tasted the
“clear stuff” that came out of his “thingy.”

Although T.S. used the
term “tried” when explaining what Stone had allegedly done to her, she also
explained that it hurt, Stone was between her legs, and that she was bleeding
after the incident.  Furthermore, T.P. testified that T.S. told her that Stone
had actually put his “thingy” inside her.  Dr. Donaruma also testified that
T.S. told her that Stone put his “thingy” in her, that it really hurt, and that
she saw blood in the toilet after the incident.  From this evidence the jury
may have found that Stone penetrated T.S.’s vagina with his penis.  See
Hooper v. State, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007) (providing that juries
are permitted to make reasonable inferences from the evidence); Jones v.
State, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, writ ref’d)
(explaining that the jury may use common sense and apply common knowledge,
observation, and experience gained in the ordinary affairs of life when giving
effect to the inferences that may reasonably be drawn from the evidence). 
Therefore, viewing the evidence in the light most favorable to the prosecution,
we conclude that a rational trier of fact could have found beyond a reasonable
doubt that Stone penetrated T.S.’s sexual organ with his penis.  See Jackson,
443 U.S. at 319; see Brooks, 323 S.W.3d at 898-99.  We overrule Stone’s
first issue complaining of T.S.’s use of the term “tried.”

2.         Date of the
Offenses

By his first, second, and
third issues, Stone asserts that the State failed to prove the date of the
offenses.[8] 
However, T.P. clarified that T.S. claimed that Stone put his hand in T.S.’s
vagina when they lived at the residence on Avenue A and that he put his penis
inside T.S. when they lived at the residence by the old high school.  A.P.
stated that they lived at the residence by the old high school when T.P. went
to Las Vegas.  T.P. testified that she went to Las Vegas at the beginning of
February 2009.  According to T.P., A.P. and Stone moved to the residence on
Avenue A at about the same time that T.P. moved to Houston and that she moved
to Houston in the middle of February or at the end of March.  T.S. moved to
Houston with T.P. in May 2009.  From this evidence the jury could have
concluded that Stone committed the sexual assaults on T.S. during the period
T.P. visited friends in Las Vegas and during the period T.P. lived in Houston.

Regardless, the State was
not required to prove the exact date of the offenses.  Dixon v. State,
201 S.W.3d 731, 736 (Tex. Crim. App. 2006) (“’[T]ime is not [usually] a material
element of an offense,’ and in some cases ‘it may be impossible for the State
to know precisely, or even approximately, when the charged offense occurred.’  Especially
where young children are involved, we have cautioned that courts cannot impose
unrealistic expectations regarding proof of when an offense actually occurred:  ‘[I]t
is not often that a child knows, even within a few days, the date that she was
sexually assaulted.’”); Garcia v. State, 981 S.W.2d 683, 685-86 (Tex.
Crim. App. 1998).  “It is well settled that the ‘on or about’ language of an
indictment allows the State to prove a date other than the one alleged in the
indictment as long as the date is anterior to the presentment of the indictment
and within the statutory limitation period.”  Sledge v. State, 953
S.W.2d 253, 255-256 (Tex. Crim. App. 1997).  Here, the indictment alleged that
the acts occurred “on or about” February 15, 2009, and the presentment of the
indictment occurred on January 13, 2010; therefore, the acts, allegedly
occurring in February or March through May 2009 occurred anterior to the
presentment of the indictment.  See id.  Accordingly, we overrule
Stone’s first, second, and third issues as they relate to his claim that the
State did not prove the date of the offenses.  See Garcia, 981 S.W.2d at
685-86.

3.         Indecency
with a Child by Contact

By his second issue, Stone
appears to first argue that the evidence showed that the touching of T.S.’s
genitals occurred at the same time that the penetration occurred and that the
State only alleged one occurrence of sexual abuse in the indictment; therefore,
Stone claims the evidence was insufficient to prove the two counts of indecency
with a child.  However, T.S. and T.P. testified that there was more than one occurrence
of sexual abuse.  The first event occurred at the residence by the old high
school, wherein Stone allegedly put his penis inside T.S.’s vagina.  The second
event occurred when Stone allegedly put his hand inside T.S.’s vagina when they
lived at the residence on Avenue A.  T.S. also described a third event wherein
Stone asked her to put his penis in her mouth and semen apparently went into
T.S.’s mouth.  T.S. claimed that Stone “tried” to put his private in her
private “a lot” in the living room and in A.P.’s bedroom.  Finally, T.S. stated
that the sexual abuse occurred “a lot” and claimed that Stone “tried” to “lick”
her private on another occasion.

Next, Stone generally
contends that there was no evidence that he intended to “gratify anyone’s
sexual desires.”  The specific intent required for the offense of indecency
with a child may be inferred from a defendant’s conduct, his remarks, and all
of the surrounding circumstances.  Sendejo v. State, 26 S.W.3d 676, 678
(Tex. App.—Corpus Christi 2000, pet. ref’d) (citing McKenzie v. State,
617 S.W.2d 211, 216 (Tex. Crim. App. 1981)).  “An oral expression of intent is
not required.  The conduct alone is sufficient to infer intent.”  Id.
(internal citation omitted).

T.S. testified that she
was alone with Stone when he allegedly put his hand in her vagina.  T.S. was
able to describe Stone’s penis to Dr. Donaruma, and she stated that she saw the
“clear stuff” come out of Stone’s penis.  T.S. claimed that Stone threatened to
hurt her if she ever told anyone what he was doing.  T.S. stated that Stone was
“trying to do nasty stuff with [her].”  From the circumstances as described by
T.S., the jury could have inferred that Stone had the intent to arouse or
gratify his sexual desire when he touched T.S.’s vagina with his hand and
exposed his penis to T.S.

Therefore, viewing the
evidence in the light most favorable to the prosecution, we conclude that a
rational trier of fact could have found beyond a reasonable doubt that Stone had
the specific intent to commit the offenses of indecency with a child.  See Jackson,
443 U.S. at 319; see Brooks, 323 S.W.3d at 898-99.  We overrule Stone’s
second and third issues regarding the intent element of indecency with a child.

III.        Lesser-Included Offense and Double
Jeopardy Violation

By a sub-issue to his
second issue, in one sentence, Stone asserts that the indecency with a child
charges were lesser-included offenses of the aggravated sexual assault charge. 
By his third issue, Stone asks this Court to reverse the trial court’s judgment
on the second count of indecency with a child and enter a judgment of acquittal
on that count because that count is a lesser-included offense of aggravated
sexual assault.  By his fourth issue, Stone contends that his double jeopardy
rights were violated because the two counts of indecency with child are
lesser-included offenses of aggravated sexual assault and all three convictions
arose from the same criminal episode.[9] 
We will address these issues together.

“A person who commits
more than one discrete sexual assault against the same complainant may be
convicted and punished for each separate act, even if the acts were committed
in close temporal proximity.”   Barnes v. State, 165 S.W.3d 75, 88 (Tex.
App.—Austin 2005, no pet.) (citing Vick v. State, 991 S.W.2d 830, 833
(Tex. Crim. App. 1999); Vernon v. State, 841 S.W.2d 407, 410 (Tex. Crim.
App. 1992)).  As stated above, in this case, T.S. described several separate
acts of sexual abuse, occurring at different locations, including, among others,
an incident wherein Stone put his hand in her vagina when they lived at the
residence by the old high school, another incident wherein Stone put his penis
in her vagina when they lived at the residence on Avenue A, and a third
incident wherein T.S. tasted Stone’s semen.  T.S. also testified that Stone
tried to put his “thingy” in her private “a lot” in A.P.’s bedroom and in the
living room.  Based on the evidence, the jury was free to infer that these
incidences were not committed all at once, as Stone argues.  The evidence
supports a finding of three separate events prompting three separate
convictions; therefore, we conclude that the indecency by contact offense
proven is not included within the aggravated sexual assault offense proven, and
the indecency by exposure offense proven is not included within the indecency
by contact offense proven.  See id.; Hutchins v. State, 992
S.W.2d 629, 633 (Tex. App.—Austin 1999, pet. ref’d untimely filed) (“Although
the two acts were committed in close temporal proximity, appellant's touching
of L.M.'s genitals with his fingers was a separate and distinct act from his
penetration of her female sexual organ with his penis.  Because appellant has
not shown that his conviction for indecency with a child by contact was based
on the same conduct underlying his conviction for aggravated sexual assault of
a child, his contention that these convictions constitute multiple punishments
for the same offense is without merit.”).  We overrule Stone’s second, third,
and fourth issues.

IV.       Modification

            In cause number 13-10-00428-CR, the
trial court’s judgment mistakenly states that Stone was convicted under section
22.02 of the penal code.  See Tex.
Penal Code Ann. § 22.02 (West Supp. 2010) (setting out the elements of
aggravated assault).  However, Stone was convicted of aggravated sexual of
assault of child pursuant to section 22.021 of the penal code.  See id.
§ 22.021(a)(1)(B)(i).  The Texas Rules of Appellate Procedure give this Court
authority to modify judgments sua sponte to correct typographical errors and
make the record speak the truth.  Tex.
R. App. P. 43.2; French v. State, 830 S.W.2d 607, 609 (Tex. Crim.
App. 1992); Rhoten v. State, 299 S.W.3d 349, 356 (Tex. App.—Texarkana
2009, no pet.); Gray v. State, 628 S.W.2d 228, 233 (Tex. App.—Corpus
Christi 1982, pet. ref’d).  Therefore, we hereby modify the judgment to
indicate that the statute under which appellant was convicted is 22.021 of the
penal code.  See Tex. Code Crim.
Proc. Ann. § 22.021(a)(1)(B)(i); see also Tex. R. App. P. 43.2; French, 830 S.W.2d at 609; Rhoten,
299 S.W.3d at 356; Gray, 628 S.W.2d at 233.

V.        Conclusion

            We affirm the trial court’s judgment
in appellate cause number 13-10-00427-CR, and we modify the trial court’s
judgment in appellate cause number 13-10-00428-CR and affirm as modified.[10]

 

 

__________________

Rogelio Valdez

                                                                                                Chief
Justice

 

Do not publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the


31st day of August,
2011.

 









[1]
In appellate cause number 13-10-00427-CR, Stone was convicted of two counts of
indecency with a child; in appellate cause number 13-10-00428-CR, he was
convicted of one count of aggravated sexual assault of a child.





[2]
We have used aliases to protect the identity of the children.





[3]
T.P. stated that when she took her trip to Las Vegas, T.S. “was very upset
every time [she] talked to her.  She was crying” and she was begging T.P. to
return home.  T.S. did not tell T.P. what was wrong.  When T.P. was in Las
Vegas, A.P. had surgery and apparently left T.S. and Papa alone with Stone. 
T.P. believed that A.P. was in the hospital for about two days.  T.P. stated
that once A.P. returned home, T.S. “wouldn’t be as upset.”  T.P. described T.S.
as being extremely “clingy” when she returned from Las Vegas.





[4]
On cross-examination, T.P. clarified that the cartoon characters “look like
real people” and that it is “anime, which is cartoon porn.”





[5]
On cross-examination, T.P. explained that she had not taught T.S. the proper
terms for the body parts and that T.S. called the penis “a thingy.”





[6]
T.P. had previously testified that Dr. Donaruma told her that the physical exam
showed signs that T.S.’s vagina had been penetrated.





[7]
Stone also generally asserts that the evidence is factually insufficient to
support his conviction; however, as Stone acknowledges, the Jackson
standard “is the only standard that a reviewing court should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense.”  See Brooks v. State, 323 S.W.3d 893, 902-03, 912
(Tex. Crim. App. 2010) (plurality op.).  Therefore, we will not address Stone’s
general assertions that the evidence is factually insufficient to support the
verdict.  See id.





[8]
Stone includes this assertion in his first issue contending that the evidence
is insufficient to prove that he committed aggravated sexual assault of T.S. 
However, because he states in his second and third issues that he “incorporates
his argument regarding legal and factual sufficiency of the evidence from” his
first issue, we will construe this assertion as applying to all of his
sufficiency complaints.





[9]
Stone’s arguments are premised on a theory that all three acts occurred on the
same day; however, T.S. described the events occurring at different residences
and on “a lot” of separate occasions.  Therefore, the jury was free to believe
that the three acts did not occur on the same day as Stone asserts.





[10]
We also dismiss as moot appellant’s motion to dismiss court appointed counsel
and appoint new counsel carried with the case on December 9, 2010, because
appellant has received the relief he requested in that motion.