

# NUMBER 13-11-00465-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

PAUL BARROW,                                                        Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

## On appeal from the 85th District Court
## of Brazos County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Perkes
Memorandum Opinion by Chief Justice Valdez**

Appellant, Paul Barrow, was convicted and sentenced to ten years' imprisonment for the first-degree felony offense of engaging in organized criminal activity involving burglary of a habitation with intent to commit aggravated robbery while using or exhibiting a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 29.03(a)(2) (West 2011);

30.02(a), (d) (West 2011); 71.02(a)(1), (b) (West Supp. 2011).[1]  By one issue, appellant argues that the evidence was insufficient to support a finding of guilt because there was insufficient corroboration of the accomplice witness testimony connecting him to the underlying offense.  We affirm.

## I. BACKGROUND

Appellant's case was tried before a jury.  The following evidence was presented during the guilt-innocence phase of the trial.

Clayton McCook testified as follows.  In 2007, he was enrolled in the veterinarian school of medicine at Texas A&M University and living in a unit at the Village on the Creek Apartments, which are located close to the campus.  On the evening of April 1, 2007, he was returning home from campus and pulling into the entrance of the complex, when, in his own words, "there's a car facing me, and I noticed that the two passenger side tires were up on the curb."  The vehicle was a "goldish champagne color" and was driving slowly with two wheels on the curb.  According to McCook, as he pulled in, "my headlights shine[d] into the car; and I can see the driver wearing a bandana, a—black and white bandanna, over his face."  The driver was also wearing a black hat.  He could see enough of the driver's face to identify him as an African American man.  He knew something was not right.  He looked in his rearview mirror and wrote down the vehicle's license plate number as SA8 JTN.  Later, he reported it to police.

As he continued to drive into the complex, McCook saw another vehicle, which was an early 1990s model vehicle, maroon in color, which he also thought was suspicious because it was parked in the center of the roadway.  As he drove around the

---

[1] This case is before the Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

2

vehicle, McCook observed a heavy-set, bearded African American man sitting inside the car.

Prior to the night of April 1, 2007, McCook had not previously seen either of the vehicles in the complex. At trial, McCook was able to make a positive visual identification of both vehicles as shown in the State's photographic evidence, exhibits 11 and 12, respectively.

Rosalinda Lopez testified as follows. On the evening of April 1, 2007, she was pulling into the Village on the Creek Apartments where she lived, when she saw an African American man driving a silver car. He was wearing a bandana over his face.

Andria Tates testified as follows. On the night of April 1, 2007, she and her family had gone to bed when she heard someone knocking on the front door. She got tired of the knocking and finally got up to answer it. She looked out a window first and saw two men. She thought they were her husband's friends. She was about to unlock the door, when it came flying open, hitting her in the stomach. At the time, she was eight months pregnant with her fourth child. One of the men raised a gun to her face and said, "Get your ass on the floor." Her children came out of their bedrooms and got down on the floor with her. They were scared and crying. Her husband ran out the back door to get help.

One man stood over her pointing the gun barrel in her face. He was a tall African American man and was wearing a bandana around his face. She was scared that the man was going to shoot her children. Meanwhile, the second man went straight into a bedroom that her husband used as a music studio. The second man was short and

was wearing a white t-shirt, black shorts and black Air Force One tennis shoes. Both men left after taking music equipment from the studio.

At trial, she was shown State's exhibit 58 and identified it as the shotgun that was pointed in her face. She was also shown State's exhibit 26, a photograph of the shotgun and a track mixer in the trunk of a car, and identified it as the same shotgun that was pointed at her and track mixer that was stolen from the studio in her home.

Darrian Tates, Andria's husband, testified as follows. On the night of April 1, 2007, he was asleep when he heard someone knocking on the front door. He thought it was people wanting to use his music equipment. Andria got up to tell them to leave. He then heard a noise and went into the kitchen. He saw a tall man inside his home. He did not see his wife or his children. He ran out the back door to get help. He identified the track mixer in State's exhibit 26 as the one stolen from his home.

Detective Bryan Ruebush of the Bryan Police Department testified as follows. At 10:19 p.m. on April 1, 2007, a robbery had occurred at the Agee Kwik Stop located at 4101 Old College Road. He and Officer Johnson checked that area but did not find anything. The robber's description was given as an African American male with a black t-shirt and a bandana on his face. At 10:26 p.m., information came in that the vehicle had a license plate of SA8 JTN and that the car was near the apartment complex by the Agee Kwik Stop. He later received further information concerning two African American men in a four-door silver or white car (possibly an Oldsmobile or Buick) and another maroon Buick with an African American man driver. At 11:59 p.m., a burglary of a habitation was reported at 1900 Sbisa Way, No. B. He reported to the scene, and Andria Tates gave him a description of the two men who had robbed her.

4

Officer Will Holt gave the following testimony. On the evening of April 1, 2007, he was dispatched to the Agee Quick Stop in response to a reported robbery. Minutes earlier, at 10:19 p.m., dispatch had relayed to him the information provided by Clayton McCook regarding a suspicious vehicle. Holt noted that the Agee Kwik Stop was located adjacent to the Village on the Creek Apartments. He obtained the surveillance video and was able to view the suspect come into the store and also see the route taken by the suspect after leaving the store. He also learned that a shotgun had been used to commit the offense.

At 11:56 p.m., Holt relayed the foregoing information to dispatch. At 11:59 p.m., dispatch informed police that there had been a robbery at the Sbisa Way apartments. According to Holt, it would take only five minutes to drive from the Agee Kwik Stop to Sbisa Way. Holt identified State's exhibit 34 as a photograph of appellant's car and identified the license plate depicted in the photograph as matching the license number reported by Clayton McCook.

Officer Benson Kilgore testified as follows. On the evening of April 1, 2007, he was responding to the robbery at the Agee Kwik Stop, when he was directed to interview Clayton McCook regarding the suspicious vehicle McCook had reported. According to Kilgore, the Agee Kwik Stop is located adjacent to the apartment complex where McCook was located. Kilgore identified State's exhibit 34 as a photograph of appellant's car and identified the license plate depicted in the photograph as matching the license number reported by Clayton McCook.

Jonathan Prior, a deputy with the Washington County Sheriff's Office, testified as follows. During the early morning hours of April 2, 2007, he was working the nightshift

5

patrol, when at approximately 12:27 a.m., he received a "be on the lookout" bulletin for vehicles that were involved in a home invasion and robbery of a convenience store. The BOLO stated:

> Attention surrounding agencies. Reference: Home invasion just occurred. Home invasion occurred 15 minutes ago. Subject armed with at least one sawed-off shotgun, three black males wearing bandanas. Suspects were seen leaving in a silver four-door Oldsmobile or Buick late model. Possibly LP SA8 JTN. Also maroon, older model Buick. Possibly the same suspects in an armed robbery of a convenience store 2200 hours. Suspects assaulted the victim of the latest robbery. Considered armed and dangerous.

Prior and another deputy who was driving a different vehicle were both parked at a gas station when two vehicles, one matching the description in the BOLO, pulled into the parking lot. Prior observed five people. Appellant was pumping gas into a silver car at the time of the stop. The other four men were having a conversation by the maroon vehicle. The officers initiated a felony stop, and the five suspects were ordered to the ground at gunpoint and then arrested. Subsequently, Prior opened the trunk of the silver car and saw a short barreled shotgun and a keyboard.

Detective Lance Matthews testified as follows. In the early morning hours of April 2, 2007, he was directed to interview five people who had been arrested in connection with the Agee Kwik Stop and Sbisa Way robberies. Before doing so, he and another investigator took photographs and retrieved evidence from the two vehicles in which the suspects had been traveling at the time they were apprehended.

One vehicle was a Ford Taurus with license number 770 LVC. Two bandanas were discovered on the front passenger-side floor board. In the backseat, a blue hoodie was discovered. Investigators found a red bandana and a black stocking cap stuffed in the seat pocket behind the front passenger seat. In the trunk of the car, they found an

6

article of clothing described as a "blue zip-up" and a microphone, which had been stolen from the apartment at Sbisa Way.

The second vehicle was a Mercury sedan with license number SA8 JTN. In the backseat of the vehicle, investigators discovered a black knit cap, a black knit shirt, and a black and white camouflage bandana. Appellant's wallet was found on the front seat. In the glove compartment, investigators found a pill bottle with a printed label showing appellant's name and address as given to police during his booking into jail. In the trunk of the vehicle, investigators found the track mixer stolen from the Tates' home on Sbisa Way, a 12-gauge shotgun, shotgun shells, the wallet of one of the customers robbed at the Agee Kwik Stop, and U.S. currency in the amount of $469 believed to be from the robbery of the Agee Kwik Stop.

Lonnie Williams testified as follows. He has been in jail since April 3, 2007. He pleaded guilty to engaging in organized criminal activity for the offenses that occurred at the Agee Kwik Stop and Sbisa Way Apartments. Part of his plea agreement was to testify truthfully against any co-defendants. Williams identified State's exhibits 29, 30, 21, 32, and 33 as photographs of himself and the four individuals he was with on April 1 and 2, 2007. One of the men was appellant.

Williams described the events surrounding the two robberies. Prior to the robberies, he asked appellant to buy shotgun shells with the understanding that they would be used to commit the robberies. Subsequently, appellant purchased the shells. The five men were travelling in two different vehicles. Williams used the shotgun to rob the Agee Kwik Stop while appellant and others drove around waiting for Williams to finish. Afterward, the five men rendezvoused and counted the money from the robbery.

7

Williams announced that he "was fixing to try to do something else." Then, Williams went to the Tates' home and knocked on the front door. Two of the other men entered the home and robbed the Tates at gun point. After robbing the home, the three men ran back to the cars. Williams hit the trunk release to appellant's car and put the shotgun and the mixing board in the trunk. They then fled the scene and were later apprehended at a gas station.

Eron Tolliver testified as follows. Tolliver pleaded guilty to the offense of engaging in organized criminal activity involving the home invasion and robbery of the Tates on Sbisa Way. He was sentenced to five years' imprisonment. In exchange for his truthful testimony, the prosecution agreed to write a letter to the Pardons and Paroles Board telling them that he had cooperated.

Tolliver testified that on April 1, 2007, he and his four "homeboys" from Go Hard Entertainment were making some home recordings when they decided to steal some music equipment to help them in their recording business. The self-described "rappers" piled into two vehicles and drove to Bryan to commit the robberies. Tolliver was riding in appellant's car with appellant. When the men reached Bryan, appellant stopped at Wal-Mart to buy shotgun shells. Someone else bought a bandana for each of the five men. Tolliver put on his bandana while in the Wal-Mart parking lot because he was expecting to take part in the robberies. He was with appellant and riding in appellant's car the entire night. The shotgun used in the robberies and found in the trunk of appellant's car belonged to Tolliver and was in the trunk of appellant's car before the robberies were committed.

Appellant testified as follows. Williams and Tolliver did not tell the truth when they testified against him. He knew nothing about any robberies. He went to Bryan for a basketball tournament. He was driving his parent's gold, champagne colored Mercury Grand Marquis. Tolliver and another man traveled with him in his vehicle. There were no discussions of a robbery, and he did not see a gun. He did not stop at any store and did not buy shotgun shells or bandanas because "obviously, you're going to be up to something wrong if you buy that." He thinks they may have stopped at a store for one of the men to buy shorts for the basketball tournament. When they arrived at an apartment complex in Bryan, appellant learned that the basketball tournament was already over. They stayed there talking for about an hour while Williams went somewhere. Williams returned, complaining about being sleepy and wanting to go home. Appellant did not notice anything unusual about his car at that time. Later, he was arrested at the gas station. He agreed that the shotgun, music board, wallet, and cash were in his trunk. He could not explain how Williams was able to put those items there without his knowledge.

## II. ANALYSIS

In his sole issue on appeal, appellant argues that the evidence is insufficient because the only evidence linking him to the underlying offense was the accomplice witness testimony of Lonnie Williams and Eron Tolliver.

### A. Standard of Review

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.) (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of the appellant that show an understanding and common design to do the prohibited act. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 307 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes

10

the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

**B.  Applicable Law:  Accomplice-Witness Testimony**

Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence "tending to connect" the defendant to the offense.  *See* TEX. CODE CRIM. PROC. ANN. § 38.14 (West 2005).  In determining whether non-accomplice evidence tends to connect a defendant to the offense, the Texas Court of Criminal Appeals has stated that "the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense."  *See Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).  "Thus, when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder."  *Id.*  The relevant inquiry is "whether a rational fact-finder could conclude that the non-accomplice evidence tends to connect appellant to the offense."  *Id.* at 509.

**C.  Discussion**

Appellant argues that the only evidence linking him to the underlying offense was the accomplice witness testimony of Lonnie Williams and Eron Tolliver.  We disagree.

At the time appellant was apprehended, he was driving a vehicle with the same license plate number reported by McCook and was in possession of the sawed-off shotgun used in the robberies, shotgun shells, a black and white camouflage bandana,

and a black cap matching the description given by McCook, the track mixer stolen from the Tates' home on Sbisa Way, the wallet of one of the customers robbed at the Agee Kwik Stop, and U.S. currency in the amount of $469 believed to be from the robbery of the Agee Kwik Stop. Appellant could not account for his possession of the incriminating items found in the trunk of his car. The foregoing evidence does not merely place appellant at the crime scene; it connects appellant to the commission of the crimes. *See Malone*, 253 S.W.3d at 257 (defendant's mere presence at the crime scene is insufficient to tend to connect the defendant to the crime but this, "when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction"). The combined cumulative weight of this incriminating evidence is sufficient to link appellant to the commission of the crimes and shows that rational jurors could conclude that this evidence sufficiently tended to connect appellant to the offenses. *See Simmons*, 282 S.W.3d at 508; *see also Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983) ("combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test"). Accordingly, appellant's sole issue is overruled.

### III. CONCLUSION

The judgment of the trial court is affirmed.

ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
6th day of December, 2012.

12