

## NUMBERS
## 13-12-00458-CR
## 13-12-00459-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

JONATHAN DEMON SHORTER,                                    Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

### On appeal from the Criminal District Court No. 1
### of Tarrant County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Perkes
### Memorandum Opinion by Chief Justice Valdez

Appellant, Jonathan Demon Shorter, was convicted of one count of burglary of a habitation with intent to commit a felony (appellate cause number 13-12-00458-CR), *see* TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011), and one count of aggravated robbery with a deadly weapon (appellate cause number 13-12-00459-CR), *see id.* § 29.03 (West 2011). Appellant received a sentence of seven years' confinement for the

burglary of a habitation conviction and eight years' confinement for the aggravated robbery conviction. The trial court ordered the sentences to run consecutively. By three issues, appellant contends that the evidence is insufficient, the trial court improperly allowed the State's expert on fingerprinting to testify, and the sentences were improperly cumulated. We affirm the judgment in appellate cause number 13-12-00458-CR, and we modify the judgment in appellate cause number 13-12-00459-CR and affirm as modified.[1]

## I. BACKGROUND

Joshua Benivedes testified that he and his brother Jonathan Benivedes shared an apartment in Grand Prairie, Tarrant County, Texas. On the morning of July 29, 2011, Joshua heard several knocks on the front door of his apartment. After peering through the peephole, Joshua opened the door a crack. A young man wearing gray sweatpants asked for "Mark," and Joshua told him that no one by that name was there. When Joshua attempted to close the door, the young man and two other men forced their way into the apartment.[2]

Joshua stated that when the men "rushed" him, he got into an altercation with one of the men, then all three of the men jumped on him, the men "slammed [him] to the ground [and one of the men] put the gun to [his] face." Joshua heard the men threaten him with comments such as "'If you want to die,' stuff like that, just verbal threats" as the men attempted to restrain him and as the gun was pointed at his head.

---

[1] This case is before this Court on transfer from the Fort Worth Court of Appeals pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

[2] Joshua described the three men as African-American.

2

When asked to describe the man who had pointed the gun at him, Joshua said, "The man with the gun was a larger male. He had a 4X black shirt on. I remember the 4X because that's what they—that's what they bound my face with. So he was wearing a—initially he had a large 4X black shirt on."[3] The prosecutor asked Joshua if the man was larger than the other men, Joshua said, "Yes, ma'am, substantially larger. I mean, the—the other two were kind of thin framed, I guess, and the one with the—the main guy with the gun was substantially larger than the other two." According to Joshua, the larger man was the "ring leader." Joshua said, "[the larger man] was in control of the situation. He was telling the other ones what to do from—that's what I got from the deal, that he was the one telling them what to do, where to go and stuff."

Joshua testified that at some point, his brother, Jonathan, entered the room and said, "Oh my God." One of the men replied, "'I'll show you oh, my god, get to the floor,' and threw him to the floor." Joshua stated that the men then began threatening Jonathan and that Jonathan appeared frightened. Joshua testified that the men then tied him up and put the 4X shirt and a pillow case over his head. Joshua described that throughout the ordeal, the men's demeanor as "very hostile" and the men repeatedly threatened to kill him. In an attempt to defuse the situation, Joshua told the men where they could find various possessions for the men to take from the apartment. Joshua stated that the three men all "dragged" him through the hallway to a closet. Joshua testified that he was injured by the men as they "dragged" him on the carpet. He said, "[I]t took skin off my arms. I have three different scars from where—you know, scars on

---

[3] Officer Brian Smeal testified that when he arrived at Joshua's apartment, Joshua gave him a black t-shirt in a baggy. The trial court admitted the black t-shirt into evidence. Officer Smeal stated that the size of the t-shirt was 4X. The defense offered the testimony of Juanita James who stated that appellant wears a size 6X t-shirt and not a size 4X. However, on cross-examination, James testified that in her experience, a man the size of appellant could wear a t-shirt size of 4X.

my elbows—elbow and on my forearm where they dragged me and it just ripped—the carpet just ripped the skin right off of me due to my weight on top of it." The men put Joshua in the closet. Joshua explained:

> I am fearful for my life the entire time, but at that point, I just went into prayer and just, you know, thinking about my daughter because with them putting me in the closet, I thought I was dead. They had a gun. They showed intent to use it. And at that point, I thought it was over with.

Joshua testified that as soon as the men closed the closet door, he "ripped out of his restraints" and waited for the men to leave. Joshua said that once he heard the front door close, he secured the front door, and called 911. While he was calling 911, Joshua ran outside to the balcony, and approximately one minute later observed a white Lincoln Navigator crossing the parking lot at a high rate of speed. Joshua saw four African-American males inside the Navigator. Joshua told the 911 dispatcher that the Navigator was the suspects' vehicle.

The police eventually returned Joshua's property to him including, "The 55-inch Internet Vizio TV; two laptops: A Toshiba, like notebook-type laptop, my Gateway laptop; my cell phone; my brother's cell phone was not returned; a PlayStation® 3, multiple games; multiple controllers; multiple HDMI cables, just the cables to hook everything up . . . ." Joshua stated that the assailants also took his brother's car title believing it to be his social security card. During his testimony, Joshua positively identified the gun that the assailants used. Later, during redirect examination, Joshua positively identified appellant as one of the assailant who attacked him in his apartment with a gun.

Brandy Elliott, a police officer with the Grand Prairie Police Department, testified that on July 29, 2011, she received a call from the dispatcher that "a robbery home

4

invasion" had occurred involving black males who were leaving the apartment complex where the invasion had occurred. The dispatcher described the suspects' vehicle as a white Navigator. Officer Elliott stated that as she was driving to the apartment complex, a white Navigator was driving out of the complex. Officer Elliott turned around, and she began following the vehicle as she waited for backup to arrive. Officer Elliot stated that she saw two occupants sitting in the front seat of the vehicle.

When she saw another officer arrive, Officer Elliott turned on the patrol car's lights to initiate a traffic stop of the vehicle. At this point, Officer Elliott observed two more individuals in the white Navigator. Officer Elliott was concerned for her safety because she knew that a gun had been used in the home invasion. Officer Elliott stated that she yelled at the occupants of the vehicle to exit and to show their hands. Officer Elliot observed "a lot of moving" in the vehicle. Officer Elliott drew her gun and shouted, "Let me see your hands. Let me see your hands. Driver, let me see your hands." No one exited the vehicle, and the occupants continued moving inside the vehicle. Officer Elliott testified that the driver then drove off, so she began pursuing the vehicle. According to Officer Elliott, the vehicle was not traveling fast, but the driver did not stop the vehicle and the occupants were not obeying her commands.

The officers followed the white Navigator as it drove through a couple of streets. The officers had their sirens and lights on during the pursuit. Officer Elliott testified that the vehicle parked, all four doors opened, and "people [ran] everywhere." Officer Elliott clarified that four black males exited the vehicle and ran from the officers.

Officer Elliot identified appellant as one of the men who ran from the vehicle. According to Officer Elliott, another officer caught appellant and then she assisted with

the arrest.[4]  Officer Elliott testified that another suspect wearing gray sweatpants was apprehended in some nearby bushes, where the officers also found Joshua's brother's car title.

Officer Elliot stated that, once appellant was secured, she went and turned off the ignition of the Navigator and preserved the scene.  Officer Elliott testified that she saw "a big TV in the back of [the Navigator], there was a—a plastic bag just behind the console on the backseat, and it had two laptops in it.  It had some cell phones in it.  And when [she] made it to the passenger door, that's when [she] saw the gun.  It was between the seat and the console."[5]  Officer Elliot observed that the gun was cocked and loaded.

April Stoll, the crime scene unit supervisor for the Grand Prairie Police Department, stated that she found a latent fingerprint on the big screen television found in the Navigator and that the latent fingerprint matched the prints she took from appellant.  Stoll explained her findings to the jury by pointing to the similarities between the latent print and appellant's print.

## II. Sufficiency of the Evidence

By his first issue, appellant contends that the evidence is insufficient to support his conviction of aggravated robbery.  Specifically, as we construe appellant's argument, he argues that there is no evidence that he used or exhibited a deadly weapon.

---

[4] Officer Alvin Sharp testified that he caught appellant as appellant was fleeing from the white Navigator.  Officer Sharp stated that appellant was attempting to evade capture.  Officer Sharp identified appellant in open court as the person he arrested that day.

[5] Detective Daniel Scesney testified that, in the Navigator, he found a gun and items that belonged to Joshua and Jonathan Benivedes, including among other things, a big screen television, and "a PlayStation® video game system."

## A. Standard of Review and Applicable Law

In a sufficiency review, we examine the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact-finder is the exclusive judge of the facts, the credibility of witnesses, and of the weight to be given testimony. *Brooks*, 323 S.W.3d at 899. We must resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). An aggravated robbery occurs when a person "commits robbery as defined in Section 29.02 and he . . . uses or exhibits a deadly weapon." TEX. PENAL CODE ANN. § 29.03. A person commits robbery "if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property" the person "(1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a) (West 2011). "In the course of committing theft" means "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1) (West 2011).

## B. Discussion

By his first issue, appellant contends that the evidence is insufficient to support his conviction for aggravated robbery because the jury "found no deadly weapon on the

Burglary of a Habitation case." Appellant states, "[t]his in effect would hold the Aggravated Robbery conviction void on its face because the evidence would be insufficient to sustain an Aggravated Robbery conviction."[6]

Other than the above quoted assertion, appellant cites no authority and makes no argument in support of his issue. Therefore, appellant has neither explained how the evidence is legally insufficient nor addressed why the jury could not have found him guilty under the law of parties. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (holding a factual sufficiency claim that merely includes a general discussion of the evidence but fails to include any argument as to how or why the evidence is insufficient under a factual sufficiency standard is inadequately briefed); *Dornbusch v. State*, 156 S.W.3d 859, 872 (Tex. App.—Corpus Christi 2005, pet. ref'd) (concluding that legal and factual sufficiency issues were waived because they were inadequately briefed); *Long v. State*, 137 S.W.3d 726, 737 (Tex. App—Waco 2004, pet. ref'd) (stating that appellant waived the legal sufficiency issue due to inadequate briefing); *Hutto v. State*, 977 S.W.2d 855, 858 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (holding where no argument is presented on how the evidence is insufficient, nothing is preserved for review). Nonetheless, we will address appellant's contention that the evidence was insufficient to show that he used or exhibited a deadly weapon.

As stated above, the jury did not find that appellant used or exhibited a deadly weapon via special issue to the burglary of habitation charge. Thus, the jury's answer established that it did not find that appellant personally used or exhibited a deadly

---

[6] In other words, the jury found, by special issue, that appellant did not use or exhibit a deadly weapon; therefore, it could not have convicted him of aggravated robbery, which requires that the defendant use or exhibit a deadly weapon.

8

weapon.[7] However, the jury charge for the aggravated robbery permitted the jury to find appellant guilty as a party to the offense.[8] Thus, the jury was not required to find that appellant personally used or exhibited a deadly weapon in order to convict him as a party to aggravated robbery with a deadly weapon. *See Koontz v. State*, 868 S.W.2d 27, 29 (Tex. App.—Fort Worth 1993, pet. ref'd) (concluding that although there was no evidence that the appellant used or exhibited the weapon himself, the evidence was nonetheless sufficient to convict him as a party to the aggravated robbery); *Escobar v. State*, 28 S.W.3d 767, 774 (Tex. App.—Corpus Christi 2000, pet. ref'd) (same). Instead, the jury was instructed that if it found from the evidence that appellant "acting with the intent to promote or assist in the commission of the offense of aggravated robbery, encouraged, aided, or attempted to aid Mikee Hopkins or Cory Booth to commit the offense of aggravated robbery, then you will find [appellant] guilty of the offense of aggravated robbery as charged in the indictment."

Moreover, Joshua testified that the men, including appellant, entered his home without his consent, threatened to kill him, one of the men pointed a gun at his head, he believed that the men would kill him, and the men took his property including a big screen television without his permission. Officer Elliott testified that she witnessed appellant flee from the scene when she attempted to stop the Navigator and fingerprint

---

[7] We note that Joshua did testify that the larger man had the gun and pointed out appellant as the man who had the gun. However, it was within the province of the jury to determine whether appellant actually used or exhibited the gun, and it determined that appellant did not. *See Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). Therefore, the only theory under which the jury may have found appellant guilty of aggravated robbery is under the law of parties.

[8] The law of parties allows the State to charge each party to an offense with its commission. Under the law of parties, "[a] person is criminally responsible for an offense committed by the conduct of another if . . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense. . ." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011).

9

expert Stoll testified that appellant's fingerprint was on the television recovered from the Navigator and eventually returned to Joshua. Thus, viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to establish that an aggravated robbery occurred and that appellant participated as a party to the offense.[9] *See Jackson*, 443 U.S. at 319; *see also Brooks*, 323 S.W.3d at 898–99. We overrule appellant's first issue.

### III. EXPERT TESTIMONY

By his second issue, appellant contends that the State's fingerprint expert's opinion was not based on a reliable methodology under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) (establishing the test a trial court must employ pursuant to rule of evidence 702 when determining whether an expert's opinion is reliable). However, the Texas Court of Criminal Appeals has concluded that "fingerprint-comparison testimony is admissible under Texas Rule of Evidence 702 because it is reliable and it assists the trier of fact in its task of determining whether a latent fingerprint is that of a particular person." *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005). Furthermore, the trial court held a hearing outside the presence of the jury to determine whether Stoll was qualified. At this hearing, Stoll explained the technique she employs when comparing fingerprints and adequately explained the theory supporting fingerprint analysis. Stoll testified that fingerprint analysis is accepted by the scientific and legal communities, the underlying scientific theory that no one has the same fingerprint has not been disproven and is readily accepted, that the technique she employed has been used and accepted by the scientific community, and that she

---

[9] We note that appellant does not challenge the sufficiency of the evidence that he committed aggravated robbery under the law of parties.

used the technique properly.  *See Vela v. State*, 209 S.W. 3d 128, 134 (Tex. Crim. App. 2006) (explaining that in order to be considered sufficiently reliable as to be of help to a jury, scientific evidence must meet three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question); *see also Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

Finally, during cross-examination, Joshua testified, without objection, that appellant's fingerprints were found on "the stuff."  *Broderick v. State*, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd) (providing that when the same evidence comes in elsewhere without objection, no harm arises).  Therefore, even assuming error, there was no harm.  *Id.*  We overrule appellant's second issue.

## IV. CONSECUTIVE SENTENCES

By his third issue, appellant contends that the trial court erred when it ordered the two sentences to run consecutively.  Appellant cites section 3.03 of the penal code for the proposition that when "two or more cases are tried together and arise out of the same 'criminal episode' the sentences must run concurrently."  *See* TEX. PENAL CODE ANN. § 3.03(a) (West Supp. 2011).  The State responds that appellant waived error because he did not object when the sentences were imposed.

Under section 3.03(a) of the Texas Penal Code, sentences generally cannot be stacked if the crimes arise out of the same criminal episode and are prosecuted in a single criminal action.  *See id.*  "[A] defendant is prosecuted in 'a single criminal action' whenever allegations and evidence of more than one offense arising out of the same criminal episode, as that term is defined in Chapter 3, are presented in a single trial or

11

plea proceeding, whether pursuant to one charging instrument or several, and the provisions of Section 3.03 then apply." *LaPorte v. State*, 840 S.W.2d 412, 415 (Tex. Crim. App. 1992). "Criminal episode" is defined as "the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property" if: (1) "the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan"; or (2) "the offenses are the repeated commission of the same or similar offenses." TEX. PENAL CODE ANN. § 3.01 (West 2011). "An improper cumulation order is, in essence, a void sentence, and such error cannot be waived. A defect which renders a sentence void may be raised at any time. Consequently, a contemporaneous objection is not necessary to preserve the error for appellate review." *LaPorte*, 840 S.W.2d at 415 (internal citations omitted).

Here, appellant was convicted in one criminal action of committing burglary of a habitation and aggravated robbery during the same transaction. The evidence presented at trial was based on the same set of facts and involved the same victim. Although there are several exceptions to section 3.03(a)'s prohibition of stacking sentences, none of those exceptions apply in this case. *See id.* § 3.03(b). Therefore, because appellant was not required to object when the trial court cumulated his sentences, we must conclude that the trial court's cumulation order is void. *See LaPorte*, 840 S.W.2d at 415. The proper remedy in such a case is to reform the judgment to set aside the cumulation order. *Beedy v. State*, 250 S.W.3d 107, 113 (Tex. Crim. App. 2008) (noting that this remedy is "reinforced" by the Court's interest in fostering judicial economy and conserving scarce judicial resources). Accordingly, we

modify the judgment in appellate cause number 13-12-00459-CR to delete the cumulation order and to provide instead that the sentence shall be served concurrent to the sentence in appellate cause number 13-12-00458-CR. *See id.*; *Robbins v. State*, 914 S.W.2d 582, 584 (Tex. Crim. App. 1996) (per curiam).

## V. CONCLUSION

We modify the judgment and affirm as modified.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of July, 2013.

13